[No. 27920. Department One. September 26, 1940.]

*In the Matter of the Estate of* WILLIAM F. P. BINGE, *Deceased.*

IDA R. BINGE, *Individually and as Administratrix, Appellant,* v. HANS MUMM, JR., *et al., Respondents and Cross-appellants.*[1]

[1]Reported in 105 P. (2d) 689.

448

*James A. Brown* and *Lester P. Edge,* for appellant.

*Randall & Danskin,* for respondents and cross-appellants.

MILLARD, J.—William F. P. Binge died intestate and without issue. Ida R. Binge filed a petition in the superior court for Spokane county, in the cause in which her late husband's estate was being probated, praying that all of the estate be distributed to her as Binge's surviving spouse. To that petition, the nephews and nieces—the sisters and brothers of Binge predeceased him—of the deceased filed objections. Trial of the issue thus made culminated in the entry of a decree of distribution, under which certain real estate, as the separate property of the deceased, was divided; a one-half interest therein was awarded to the widow, and the other half interest was awarded to the nephews and nieces, collectively, who objected to the widow's petition. The widow appealed from that part of the decree adjudging three parcels of land, hereinafter described, to be separate property of the deceased instead

of community property of the marital community of the deceased and his surviving wife. The objecting nephews and nieces cross-appealed from that portion of the decree awarding the widow an eight hundred dollar interest in certain separate real property of the deceased, the distribution to the widow of all personal property belonging to the estate, and the family allowance to the widow of $125 monthly from October 1, 1939, until final distribution of the estate.

The facts are as follows:

In 1880, at which time he was twenty-one years old and possessed of an inheritance of fifteen hundred dollars, William F. P. Binge, a German immigrant, arrived in the United States. He was accompanied by two other German immigrants, his sister and her husband (Hans Mumm), who settled on land near Plaza.

Shortly after his arrival in this country, Binge, who had served his apprenticeship as a miller in Germany, was employed in a flour mill in Spokane. He resigned from that employment in 1892 to become the agent of the Farmers' Warehouse at Plaza. His work consisted of buying and selling wheat, for which he received compensation of sixty dollars monthly.

In 1894, Binge and one Zach Stewart, as partners, bought one warehouse and leased another. This partnership, which was concluded in 1903 when the partners sold their business, was engaged extensively in warehousing and in the buying and selling of grain at Plaza. Stewart testified that the warehouse purchased by the partnership cost "a few hundred dollars; less than one thousand dollars, I think." He further testified that, when the business was sold, he received less than one thousand dollars as his share of the proceeds of the sale; and that, from 1894 until dissolution of the partnership, Binge did not obtain money from any

source other than income from the business in which the partners were engaged.

Binge was efficient, energetic, and frugal. One economy of this man was to sleep in the warehouse when he was agent for the Farmers' Warehouse at Plaza. Beginning in the year 1903, Binge commenced to acquire wheat land. Up to the time of his marriage in 1913, he had purchased wheat land in Canada and in eastern Washington, and he also held under lease more than one thousand acres of wheat land in Spokane county. All of these farms were adequately equipped with horses and machinery purchased by Binge. When Binge and Stewart dissolved their partnership, Binge leased the "Marshall Field" land of four hundred acres adjoining the town of Plaza. He continuously farmed this tract under a lease until he purchased same in 1915.

On October 29, 1913, Binge, who was then fifty-four years old, married appellant, who was thirty-three years old. This was his first marriage and her second marriage. No children were born of this union. Appellant testified that she had approximately twelve hundred dollars, which she turned over to Binge when she married him in 1913. In 1926, she received from her father's estate one thousand dollars, which she also gave to her husband for use of the marital community. Appellant also testified that she contributed to the community for a period of four to five years her earnings from teaching music to a few pupils.

At the time of his marriage to appellant, Binge was farming wheat land both as a landlord and as a tenant. He was also interested in a warehouse. Probably one year, or less, after the marriage of decedent to appellant, the former discontinued active work and confined his efforts to supervision of his farms, on none of which the marital community resided.

There is no showing that Binge had any earnings from his personal labor after his marriage. He performed no work other than that of looking after his lands and collecting the rentals from lands leased by him to certain tenants; that is, so far as is disclosed by the record before us, Binge had no income from any source other than from the lands which are the subject matter of this controversy, and from other lands also owned by him.

The history of the acquisition of the three tracts, which appellant insists are community property and claimed by respondents to be the separate estate of William F. P. Binge, who died September 20, 1938, is as follows:

(1) On May 6, 1903, Binge and A. E. Rogers entered into a contract to purchase from the state the northeast quarter of section 16, township 21 north, range 44 E. W. M., Spokane county. Of the purchase-price of $6,824, the purchasers paid $920 at the time the contract was executed. Rogers assigned his interest in the contract to Binge, November 30, 1903. The interest on the principal was paid annually on this contract, but nothing was paid on the principal, except the down payment of $920, until March 1, 1917, when $656 was paid. Thereafter, the payments on the principal were made $1,312, March 5, 1918; $1,312, February 28, 1919; $656, March 3, 1920; $656, March 3, 1926; and the final payment of $1,312, February 24, 1927. On March 1, 1927, a deed to the land was obtained by Binge from the state. All of the installments on the principal, except the first in the sum of $920, at the time of the execution of the contract, were paid after the marriage of Binge to appellant.

(2) In 1895, Binge purchased the southeast quarter of section 13, township 21, range 43, E. W. M., Spokane county. He sold this land thereafter to a third

person, who lost it on a mortgage foreclosure. Binge then purchased this quarter section from the mortgage company January 21, 1908, as evidenced by deed to him executed on that date. This land was acquired by Binge five years prior to his marriage to appellant.

(3) On November 1, 1915 (two years after his marriage to appellant), Binge entered into a contract to purchase a tract of land, known as the "Marshall Field" land, which Binge held under lease executed prior to his marriage, as related above. Of the purchase price of thirty thousand dollars, the amount of five thousand dollars was paid at the time of the execution of the contract. A second payment of five thousand dollars was made November 1, 1916; and on October 18, 1917, two mortgages on this land—one for nine thousand dollars and one for eleven thousand dollars—were executed by decedent and appellant to secure payment to a Mr. Baker of a loan of twenty thousand dollars. This money was used to pay the balance due on the contract, whereupon deed covering this land was executed and delivered to Binge. Neither in the contract of purchase nor in the deed that was delivered upon payment of the purchase-price does the name of appellant appear as one of the purchasers. The mortgage for nine thousand dollars was released October 7, 1919. The mortgage in the sum of eleven thousand dollars was released April 24, 1931. On May 11, 1931, decedent and appellant executed a mortgage on this "Marshall Field" land, to secure payment to Hans Mumm of a loan of five thousand dollars. That mortgage is still unpaid.

The parties do not agree as to the source from which was obtained the initial payment of five thousand dollars on this "Marshall Field" land. October 25, 1915, decedent borrowed from Hans Mumm three thousand

dollars, to secure the payment of which he executed a mortgage in favor of the lender on the southeast quarter of section thirteen (the second tract described above), which was separate property acquired by decedent in 1908. That mortgage was released June 16, 1923. On October 27, 1915, decedent borrowed from Hans Mumm two thousand dollars. Binge executed a mortgage on the southeast quarter of section thirteen (decedent's separate property) to secure payment of this loan. This mortgage was released November 4, 1929. These two loans, aggregating five thousand dollars, were made only a few days prior to purchase of the "Marshall Field" land.

Appellant testified that, of the initial payment of five thousand dollars November 1, 1915, on the "Marshall Field" land, three thousand dollars was a loan, payment of which was secured by mortgage on the southeast quarter of section thirteen described in the preceding paragraph; that eight hundred dollars of the first payment was the amount that was remaining from the proceeds of the sale of the crop of wheat on the "Marshall Field" land that year; and that twelve hundred dollars was money earned by appellant prior to her marriage to decedent to whom she gave the money subsequent to her marriage to him for use of the marital community. Appellant testified that the loan of two thousand dollars, payment of which was secured by mortgage on the southeast quarter of section thirteen, was used in the payment of taxes, interest, and other indebtedness.

Hans Mumm, eighty-seven years old, a brother-in-law of the decedent, testified that, when decedent borrowed the five thousand dollars on two mortgages —one for three thousand dollars and one for two thousand dollars—in 1915 on his separate property, he stated that he wanted the money to use in purchasing

the "Marshall Field" land. Mumm also testified that, at the time he let decedent have the money, he did not deem Mrs. Binge's signature on the mortgage was essential, as the land mortgaged was the separate property of Binge, who insisted that the land he was mortgaging was his separate property and that it was not necessary for his wife to sign the mortgage.

The credibility of Mumm, on the basis of his age and his interest in the case, and the fact that his testimony was addressed to occurrences of approximately a quarter of a century ago, is challenged by appellant. However, the trial court was in a better position than we to pass on the credibility of the witnesses. The trial court found that the five thousand dollars borrowed by Binge on his separate property was used to make the down payment on the "Marshall Field" land; that no community credit was pledged; and that the loan of five thousand dollars was paid from the income of Binge's separate property.

Counsel for appellant argue that all income of appellant and the decedent after marriage was community property by reason of its commingling, which made it impossible to trace the funds and to determine definitely which were separate and which were community funds. It is insisted that the subject matter in controversy is community property, for the reason that the presumption that same was purchased with community funds was not rebutted.

The following authorities are cited in support of appellant's position:

In *Jacobs v. Hoitt*, 119 Wash. 283, 205 Pac. 414, we had for decision the legal character of the stock, fixtures, and profits of a business commenced before and continued during marriage. We held that the status of property is to be determined as of the date of its acquisition. If acquired before marriage, either by

the use of separate funds or the pledging of separate credit, the property is separate property and remains so unless changed by agreement of the parties or operation of law; and there is no distinction in this regard between real and personal property, though, of course, the evidence of a change of status of real property would, ordinarily, be more susceptible of positive proof than such a change in personal property. We further held that profits from the husband's separate business (which business was acquired by the husband prior to his marriage), increased by the labor or effort of husband and wife, constitute separate property, to the extent of such earnings, where they can be separated; but money in the bank which it was impossible to segregate as to its sources, so confused that it cannot be apportioned, will be regarded as community property, in view of the presumptions and favor of the law in which it is regarded; that, as the husband had put eight thousand dollars of separate funds into the business before marriage, and after the community was created six thousand dollars were added which could be presumed to be community property, eight parts of the present value of the plant were separate property and six parts were community property.

In *In re Carmack's Estate,* 133 Wash. 374, 233 Pac. 942, in which *Jacobs v. Hoitt, supra,* is cited with approval, Mrs. Carmack turned over to Mr. Carmack money which was her separate property, and that money was used in the general community business.

"But all of the money was turned over to Mr. Carmack and thereafter it is impossible to trace it in its separate character. It was swallowed up in the general community business transactions."

We again held that, where separate funds have become so commingled with community funds as to make it impossible to trace the former or tell which are

separate and which are community funds, all funds, or property into which they have been invested, belong to the community.

In *Rawleigh Co. v. McLeod,* 151 Wash. 221, 275 Pac. 700, 64 A. L. R. 238, we held that the title to property acquired by a husband after marriage, by trading separate property owned by him before marriage, remains vested in the husband as his separate property, subject to an equitable accounting on supplemental proceedings under a subsequent judgment on the separate debt of the husband; notwithstanding the wife made a substantial contribution out of her separate estate for its purchase, and later for its improvement, and the parties, during more than twenty years, greatly enhanced its value by their labor under an oral agreement at the time of its acquisition that they would make it their home and that the wife's separate money should be devoted to improving it along with all other resources and that it should belong to one as much as to the other. The explanation of that holding, which was by a divided court—three judges agreed with the author of the major opinion, two judges concurred in the result and three judges dissented—was

" . . . that the title, when taken, vested in respondent alone, as his separate estate, and, since there has been no conveyance by Olson [husband] or by operation of law, the title still remains in him and subject to the lien of the judgment in its proper order. What that order may be, whether it is preceded by an equitable lien in favor of the community, by homestead rights, or other liens and encumbrances, can all be determined if, and when, such prior rights are asserted at any time before sale on execution or perhaps, as to some, afterwards."

The explanation of the concurrence in the result is as follows:

"There is no sufficient basis in the record for the formation of any opinion as to the proportion of the present value of the real estate in question which is the result of the efforts of the community composed of respondents O. I. Olson and wife and that which is due to an increase in value of the property from other causes."

One dissent was "upon the authority of the case *In re Carmack's Estate,* 133 Wash. 374, 233 Pac. 942." One dissent is upon the theory that the property became community property by confusion and commingling; and also the executed oral agreement, which was not made to defraud creditors, was binding, not only as to the spouses, but as to all the world. Respecting the rule that the status of the title to property is fixed as of the time of its acquisition, the rule concerning commingling of funds, and the rule that an executed oral agreement, like the one then before the court, between spouses binds all the world, the following sustaining authorities were cited:

*In re Slocum's Estate,* 83 Wash. 158, 145 Pac. 204; *In re Curtis' Estate,* 116 Wash. 237, 199 Pac. 309; *In re Buchanan's Estate,* 89 Wash. 172, 154 Pac. 129; *Union Securities Co. v. Smith,* 93 Wash. 115, 160 Pac. 304, Ann. Cas. 1918E, 710; *Volz v. Zang,* 113 Wash. 378, 194 Pac. 409; *In re Deschamps' Estate,* 77 Wash. 514, 137 Pac. 1009; *Morse v. Johnson,* 88 Wash. 57, 152 Pac. 677; *Rawlings v. Heal,* 111 Wash. 218, 190 Pac. 237, and *In re Sanderson's Estate,* 118 Wash. 250, 203 Pac. 75.

In the third dissenting opinion, the pertinent portion of which reads as follows, is argument in support of the rule which appellant seeks to invoke and which, it is contended, was followed in *Salisbury v. Meeker,* 152 Wash. 146, 277 Pac. 376, and in *State ex rel. Van Moss v. Sailors,* 180 Wash. 269, 39 P. (2d) 397:

"There is still another reason why I think the property should be held to be the community property of

the respondents. It is a rule, well settled in this jurisdiction, that, where separate funds have been so commingled with community funds that it is impossible to apportion them, all of the commingled fund, or the property acquired thereby, is community property; this because of the presumption in favor of the community and the favor with which the law regards such property. *Yesler v. Hochstettler,* 4 Wash. 349, 30 Pac. 398; *Doyle v. Langdon,* 80 Wash. 175, 141 Pac. 352; *In re Buchanan's Estate,* 89 Wash. 172, 154 Pac. 129; *Jacobs v. Hoitt,* 119 Wash. 283, 205 Pac. 414; *In re Carmack's Estate,* 133 Wash. 374, 233 Pac. 942. As shown by the recital of the facts made in the majority opinion, the present value of the property in question is the result, for its far greater part, of the community efforts of the husband and wife. They have brought it from a comparatively small value to its now considerable worth. How much of this increased value is due to natural causes, or is due to the community efforts of the respondents, there is now no way of ascertaining with any degree of exactness. It is again to be remembered in this connection that, when the funds were actually commingled, there was no separate creditor of either spouse who had a right to complain of the acts of the parties in that regard; that the creditor now complaining became such long after the commingling commenced, and after it had continued for a period more than double the time fixed by the statute of limitations as a bar to a recovery of the property, even by one who could show a superior outstanding title. There was here, in my opinion, such a commingling of separate and community funds as to require the application of the rule above cited, rather than the rule applied by the majority."

In *Salisbury v. Meeker, supra,* we held that gains and profits acquired after marriage in the prosecution of a business established by the husband before marriage, are community property, where they were the result of the *joint efforts of both husband and wife,* rather than rents, issues, and profits produced by the separate estate, as there was no way of segregating

the portion of the funds produced by the business from the portion which was produced by the personal efforts of the husband. In the course of the opinion, we said:

"In *In re Buchanan's Estate,* 89 Wash. 172, 154 Pac. 129, where the original investment of separate funds in personal property was small, and there was a large increase in the value of the property, principally due to the personal efforts of the husband, and it was difficult to ascertain the true proportion of the original investment as compared with the value of the property at the time of the wife's death, it was held that the property had ceased to be separate and had become that of the community. It was there said:

" 'These observations, we think, in any event, lead to the conclusion that the gains and profits produced by the personal efforts of appellant, though added to, in a measure, by the original investment, become community property.'

"In the present case, if it be conceded, without so deciding, that a part of the money garnisheed was the result of an established business, the separate property of the husband at the time of his marriage, and that this business contributed to the fund in question, the result would be the same, because there is no way of segregating the portion of the fund produced by the business from the portion that was produced by the personal efforts of Mr. Salisbury. In *Jacobs v. Hoitt,* 119 Wash. 283, 205 Pac. 414, it was said:

" 'In regard to the money in the bank, it is impossible to segregate that as to its sources. Its separate and community natures have become so confused that the court cannot apportion them, and the favor with which community property is regarded and the presumptions in favor of it are such that we must agree with the trial court that these funds in bank are the property of the community and not subject to the appellant's judgment.' "

In *State ex rel. Van Moss v. Sailors, supra,* we held that, where the status of real or personal property, fixed at the time of its acquisition, is shown to be that of separate property, the presumption is that it and its

rents and profits continue such, and is not overthrown where undivided separate property was brought into the state with the understanding it should remain so and its identity preserved when invested in this state; there being no evidence of any agreement between the parties to change its character. We further held there was no commingling of separate property with community property sufficient to destroy its identity where the business in which the separate property was invested is capable of identification and division, and any additions in the way of services by a member of the community have been offset by withdrawals for living expenses. We spoke as follows respecting the rules to be kept in mind in determining whether separate property has, in fact, been changed from separate into community property:

"It is undoubtedly true that husband and wife may, by proper agreement or conveyance, change their separate property into community property and their community property into separate property. *Gage v. Gage,* 78 Wash. 262, 138 Pac. 886; *Volz v. Zang,* 113 Wash. 378, 194 Pac. 409. But in determining whether separate property has, in fact, been changed from separate into community property, the following rules have been definitely settled by this court and are to be kept in mind: (1) The status of property, whether separate or community, is to be determined as of the date of its acquisition; (2) this rule is true with reference to personal property as well as with reference to real property; (3) if the property is once shown to have been separate property, the presumption is that it continues separate property until that presumption is overcome by evidence; (4) separate property continues to be separate property through all its changes and transitions, as long as it can be clearly traced and identified; (5) the rents, issues and profits of separate property remain separate property. *In re Brown's Estate,* 124 Wash. 273, 214 Pac. 10; *Rogers v. Joughin,* 152 Wash. 448, 277 Pac. 988.

"In *Guye v. Guye,* 63 Wash. 340, 115 Pac. 731, 37 L. R. A. (N. S.) 186, it was said:

" 'Moreover, the right of the spouses in their separate property is as sacred as is the right in their community property, and when it is once made to appear that property was once of a separate character, it will be presumed that it maintains that character *until some direct and positive evidence to the contrary is made to appear.'* (Italics ours.)"

In *In re Buchanan's Estate,* 89 Wash. 172, 154 Pac. 129, another citation by appellant, we considered the question of the combination of separate property with the toil and talent of the husband, as productive factors, and the effect of such a combination on the legal character as separate or common of the product of these two factors. The property involved in that case was the shares of the capital stock of a corporation. The corporation was organized prior to marriage, and the husband, before marriage, acquired six shares of this stock; after the marriage, the husband acquired three other shares. At the time of the wife's death, the entire capital stock of the company, fifty shares, was owned one-half by the husband, the other half by a third person. Neither the testimony nor the findings of the court, as reported in our opinion, trace the husband's original shares into those held by him at the time of the wife's death, and the trial court held that there had been such a commingling of the original separate shares of the husband with other shares acquired during marriage that the identity of the former was lost, and all were therefore common. In sustaining the trial court in that ruling, we said:

"It may also be said that our decision in *Katterhagen v. Meister,* 75 Wash. 112, 134 Pac. 673, and decisions therein noticed, are in harmony with our conclusions here reached touching the question of investments of funds borrowed during coverture becoming community property though borrowed upon the credit of one

spouse, the theory being that such gains are the product of community individual efforts.

"These observations, we think, in any event, lead to the conclusion that the gains and profits produced by the personal efforts of appellant, though added to, in a measure, by the original investment, become community property. We agree, however, with the trial court that the funds, though at the beginning separate property of appellant and Sarah A. Buchanan, in the proportion of four-ninths and five-ninths, which purchased the stock in the first instance, have during the ten years' of coverture become so intermingled with community property and lost their identity as separate property that all of the stock and interest in the Puget Sound Lumber Company, standing in appellant's name, became the community property of appellant and his deceased wife, Sarah A. Buchanan."

Another ground of decision was the combination of, the two factors, the husband's separate property and the toil and talent of the husband. Of the corporation mentioned, we observed that,

"When the manner of its operation and financing is considered, it might be said to have been operated much as a partnership, though it can hardly be said that it was not technically a corporation."

We made the further observation that the husband was something more than a mere salaried officer of the corporation; he practically made it and its wealth. The property involved was not real property. If it had been, there would not, of course, have been any trouble in tracing its identity, and the increase in value would have gone to the owners. We said, respecting our opinions in *Guye v. Guye*, 63 Wash. 340, 115 Pac. 731, 37 L. R. A. (N. S.) 186, and other cases in this jurisdiction, cited by counsel for appellant, in support of the theory that the shares of stock were the separate property of appellant in the beginning because of his claimed ownership of the money which then purchased

it, and that its increased value because of the growth of the business and property of the company also became his separate property, that:

"We are unable to gather from these observations of the court any rule more favorable to counsel's contention than that specific real or personal property once becoming separate property remains so, unless by voluntary act of the spouse owning it its nature is changed. But this, it seems to us, does not solve the question of when profits or gains resulting largely from personal efforts of one of the spouses become separate or community property. It is by no means always clear that such profits and gains are or are not rents, issues and profits of separate property, though separate property may have, in a measure, contributed to such gains.

"The property here involved is not real property; nor do we think that the original investment, from which in a measure it comes, was in any event at the beginning more than four-ninths the separate property of appellant, five-ninths at least being the then separate property of deceased. Nor can we concur in the view that the same twenty-fold increase in value of this original investment resulted as a natural increase apart from the personal efforts of appellant while a member of the community. We are constrained rather to the view that such change, increase and growth in the business and its property was very much more the result of the personal efforts of appellant during the ten years of his married life, in the performance of which he was the servant of the community. As we view it, we are then confronted with the question, What was the principal producing cause of these profits and gains? This may not be a very exact or satisfactory rule of determining whether property is community or separate. But where a small original investment of separate funds is united with the personal efforts of a member of the community, and therefrom profits and gains to the extent of some twenty-fold are returned, the property being personal and undergoing many changes, we know of no other rule by which the question of such gains being community or separate property can be determined other than by taking into account the rela-

tive contributing force of the original investment and the personal efforts of a member of the community. The authorities do not furnish us much light upon this question, in so far as decisions directly in point are concerned. However, in *Yesler v. Hochstettler*, 4 Wash. 349, 366, 30 Pac. 398, observations were made by Judge Stiles, speaking for the court, quite in harmony with this view as follows:

" 'In this case the land purchased with the borrowed money paid for itself, and a large profit in land and money besides. It was a speculation purely personal in which the energy, skill and business prudence of Mrs. Yesler certainly were greater factors than the credit given by the mortgage of her land. But these mental forces, whether of husband or wife, are servants of the community, and their products are its property, to be shared in equally by the members of the community, and to follow the channels of devise and descent provided by the statute.'

"In *Lake v. Bender*, 18 Nev. 361, 4 Pac. 711, 7 Pac. 74, the question was presented somewhat as it is here, and was reviewed at some length. Justice Leonard, speaking for the court, observed:

" 'And in this or any other case, if profits come mainly from the property, rather than the joint efforts of the husband and wife, or either of them, they belong to the owner of the property, although the labor and skill of one or both may have been given to the business. On the contrary, if profits come mainly from the efforts or skill of one or both, they belong to the community. It may be difficult in a given case to determine the controlling question, owing to the equality of the two elements mentioned, but we know of no other method of determining to whom the profits belong. In the use of separate property for the purpose of gain, more or less labor or skill of one or both must always be given, no matter what the use may be; and yet the profits of property belong to the owner, and in ascertaining the party in whom the title rests, the statute provides no means of separating that which is the product of labor and skill from that which comes from the property alone.' " *In re Buchanan's Estate*, 89 Wash. 172, 154 Pac. 129.

■ The general rule that the commingling of separate and community property so that each is indistinguishable from the other renders the mass common, is subject to the qualification that, when the community property is inconsiderable in comparison with the separate property, the mass remains separate.

"In a confusion of goods there is such an intermixture and blending that the parts belonging to the several owners can not be distinguished, nor separated. As to the blending of separate and community property, the general rule is that the confusing of separate and community property so that each is indistinguishable from the other renders the mass common for the reason that the separate owner is not able to establish his separate right to any article of the mass, nor prove his right to a computable share of it. In such a case the presumption in favor of the community controls the court's judgment and requires that the mass be declared common. [*Yesler v. Hochstettler*, 4 Wash. 349.] There is a modification of this general rule that . . . when the community property is inconsiderable in comparison with the separate property, the mass remains separate." McKay, Community Property (2d ed.), § 308.

The statute of 1871 (Laws of 1871, p. 67), defining the rights of persons and property as affected by marriage, provided that all property owned by the husband or wife at the time of the marriage, and all property acquired by either of them during the marriage by gift, devise, descent, bequest, or inheritance, and all property purchased or credited with the separate funds of either during the marriage and designated as separate property, as per deed or inventory in accordance with the provisions of this statute, should be the separate property of the spouse acquiring it, the same as if no marriage existed. Section 2 of the statute, p. 67, provided that all property acquired during the marriage by the joint labors of the husband and wife, or by

their individual labors, together with all rents, profits, interest or proceeds of the separate property of both accruing during the marriage, should be common property.

The 1871 statute was repealed by Laws of 1873, p. 450. The most important change was that the 1873 statute did not provide that the rents, profits, issues, or proceeds of the separate property of the spouses should be *common* property. In 1879, a community property law (Laws of 1879, p. 77), which reads so far as pertinent, as follows, was enacted:

" . . . all property of the wife, owned by her before marriage, and that acquired afterwards by gift, bequest, devise or descent, with the rents, issues and profits thereof, is her separate property, and all property owned by the husband before marriage and that acquired by him afterwards by gift, bequest, devise or descent, with the rents, issues and profits thereof, is his separate property.

"Sec. 2. All other property acquired after marriage by either husband or wife, or both, is community property, except such as may be acquired as is provided in the first section of this act."

Our present law (Rem. Rev. Stat., §§ 6890, 6891, 6892 [P. C. §§ 1432, 1424, 1433]; Code of 1881, §§ 2408, 2400, 2409; 1 H. C., §§ 1397, 1398, 1399), defining separate property and community property, reads as follows:

"Property and pecuniary rights owned by the husband before marriage, and that acquired by him afterward by gift, bequest, devise or descent, with the rents, issues and profits thereof, shall not be subject to the debts or contracts of his wife, and he may manage, lease, sell, convey, encumber, or devise, by will, such property without the wife joining in such management, alienation, or encumbrance, as fully and to the same effect as though he were unmarried." Rem. Rev. Stat., § 6890.

"The property and pecuniary rights of every married woman at the time of her marriage, or afterward ac-

quired by gift, devise, or inheritance, with the rents, issues, and profits thereof, shall not be subject to the debts or contracts of her husband, and she may manage, lease, sell, convey, encumber or devise by will such property, to the same extent and in the same manner that her husband can, property belonging to him." Rem. Rev. Stat., § 6891.

"Property, not acquired or owned as prescribed in the next two preceding sections, acquired after marriage by either husband or wife, or both, is community property. The husband shall have the management and control of community personal property, with a like power of disposition as he has of his separate personal property, except he shall not devise by will more than one-half thereof." Rem. Rev. Stat., § 6892.

(1) Respecting the first tract of land—the northeast quarter of section sixteen, which was purchased by Mr. Binge from the state under a contract May 6, 1903, for a consideration of $6,824, of which $920 was paid at the time of the execution of the contract while Mr. Binge was unmarried—counsel for appellant insist that, as the status of the property is to be determined as of the date of its acquisition, the tract should be distributed as community, except at most the initial payment of $920; that is, the most that Mr. Binge could claim as of right as his separate property would be the down payment of $920 made by him prior to his marriage to appellant. It will be remembered that all subsequent payments, aggregating $5,904, were made after his marriage to appellant, and the deed to the property was not obtained until March 1, 1927, nearly fourteen years after the marriage of the Binges.

In support of this position, counsel cite *Yesler v. Hochstettler,* 4 Wash. 349, 30 Pac. 398; *Heintz v. Brown,* 46 Wash. 387, 90 Pac. 211, 123 Am. St. 937; *Guye v. Guye,* 63 Wash. 340, 115 Pac. 731, 37 L. R. A. (N. S.) 186; *Katterhagen v. Meister,* 75 Wash. 112, 134 Pac. 673; *Rawlings v. Heal,* 111 Wash. 218, 190 Pac. 237; *In re*

*Kuhn's Estate,* 132 Wash. 678, 233 Pac. 293; and *Walker v. Fowler,* 155 Wash. 631, 285 Pac. 649.

In *Yesler v. Hochstettler, supra,* the first case in this state where the question was considered, we held that property acquired through a purchase on credit by the wife was common, applying the statutory formula. See, also, *Main v. Scholl,* 20 Wash. 201, 54 Pac. 1125.

In *Heintz v. Brown, supra,* we held that, where a wife purchases lands, paying part of the price with her separate funds and the balance with money borrowed by her on the land, the same becomes community property in the proportion that the sum borrowed bears to the separate funds invested therein; and an execution sale for a community debt will be enjoined only to the extent of her separate interests.

In *Graves v. Columbia Underwriters,* 93 Wash. 196, 160 Pac. 436, we endeavored to explain or distinguish *Heintz v. Brown, supra,* in which we held that the proceeds of a loan to husband and wife for property purchased therewith, although the money was borrowed on the security of the separate property of one spouse, would constitute community property. Sections 5915, 5916 and 5917, to which reference is made, are the same as Rem. Rev. Stat., §§ 6890, 6891, 6892.

We said:

"The separate property of a wife is defined by Rem. 1915 Code, § 5916, as follows:

" 'The property and pecuniary rights of every married woman at the time of her marriage, or afterwards acquired by gift, devise, or inheritance, with the rents, issues, and profits thereof, shall not be subject to the debts or contracts of her husband, and she may manage, lease, sell, convey, encumber or devise by will such property, to the same extent and in the same manner that her husband can, property belonging to him.'

"The preceding section of the code, Id., § 5915, after defining the husband's separate property, provides that he may manage and incumber it without the joinder of

his wife, as fully and to the same extent as if he were unmarried. Id., § 5917 provides that, 'Property, not acquired or owned as prescribed in the next two preceding sections, acquired after marriage by either husband or wife, or both, is community property.'

"Under these sections, we have held that the proceeds of a loan to husband and wife, and property purchased therewith though the money was borrowed on the security of the separate property of one spouse, would constitute community property. *Yesler v. Hochstettler*, 4 Wash. 349, 30 Pac. 398; *Main v. Scholl*, 20 Wash. 201, 54 Pac. 1125; *Heintz v. Brown*, 46 Wash. 387, 90 Pac. 211, 123 Am. St. 937.

"It will be noticed in these cases that the decision is rested on the ground that additional property was acquired with the borrowed money, or that such money was put to other uses for the benefit of the community. The present case is readily distinguishable by reason of the fact that the money was borrowed solely for the purpose of preserving the wife's separate property from loss under tax foreclosure. The statutes give the right to married persons to manage and encumber their separate property as fully as though they were unmarried. It certainly falls within the proper management of one's separate property to take measures against its sequestration for taxes, and the incumbering of one's property to raise money for such a purpose amounts to nothing more. If the money is not devoted to any community purpose, it retains its status as separate property. The joinder of the husband in the note and mortgage on his wife's separate property, an act exacted by the person making the loan in an excess of precaution, would not convert the money acquired thereby into a community fund, if it was in no way applied to community uses. We have held in the case of *Dobbins v. Dexter Horton & Co.*, 62 Wash. 423, 113 Pac. 1088, that the joinder by a husband with his wife in a note and mortgage upon her separate property would not make the property nor the proceeds therefrom community property. While the presumption naturally arises that property acquired during the marital relation is community property, the presumption is a rebuttable one. *Weymouth v. Sawtelle*, 14 Wash. 32, 44

Pac. 109. In the present case, the facts indisputably show that the borrowed money was in no way devoted to a community use, but solely for the benefit of the separate property on which it was raised. The status of Mrs. Fife's separate property, having been fixed as such at the time of its acquisition, would remain so fixed unless changed by deed, due process of law, or by the working of some form of estoppel. *Katterhagen v. Meister*, 75 Wash. 112, 134 Pac. 673; *In re Deschamp's Estate*, 77 Wash. 514, 137 Pac. 1009; *Morse v. Johnson*, 88 Wash. 57, 152 Pac. 677.

"The money arising from the mortgage upon Mrs. Fife's separate property never having become community property, under the facts and the law, there was, of course, no commingling of community with separate property, as contended by appellant. Hence no question of the right of a community creditor to follow community funds commingled with separate property is presented."

The pertinent portion of the opinion in *Katterhagen v. Meister, supra,* upon which appellant relies, reads as follows:

"Upon the merits of the controversy, we think the learned trial court reached a wrong conclusion in holding that the property was the separate property of George Meister. He paid $1,600 upon the purchase price from his separate funds. To that extent the property was separate. The remainder, or $5,050, was paid by the community. When the husband and wife united in the promissory note, the debt created was a community debt, and the money borrowed upon the note belonged to the community. It is not material whether they borrowed the money of a third party and paid it to the vendor or gave their note direct to him as a part of the purchase price. The rule would be the same in either case. Nor does the fact that the husband later paid the note out of his separate funds change the situation. The status of the property was fixed at the time of the purchase. These views are supported by an unbroken current of decisions in this court. *Yesler v. Hochstettler,* 4 Wash. 349, 30 Pac. 398; *Main v. Scholl,*

:20 Wash. 201; 54 Pac. 1125; *Heintz v. Brown,* 46 Wash. 387, 90 Pac. 211, 123 Am. St. 937; *Ballard v. Slyfield,* 47 Wash. 174, 91 Pac. 642; *Denny v. Schwabacher,* 54 Wash. 689, 104 Pac. 137, 132 Am. St. 1140; *United States Fidelity & Guaranty Co. v. Lee,* 58 Wash. 16, 107 Pac. .870.

"In the case last cited, in considering the determina-·tive principles in cases of this character, we said:

" 'Where property is acquired during marriage, the test of its separate or community character is whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof; the presumption always being that it is community property, but this presumption may be re-·butted by proof.' "

In *Rawlings v. Heal,* 111 Wash. 218, 190 Pac. 237, we .said:

" 'Where property is acquired during marriage, the ·test of its separate or community character is whether it was acquired by community funds and community .credit, or separate funds and the issues and profits thereof; the presumption always being that it is community property, but this presumption may be re-butted by proof.' *United States Fidelity & Guaranty Co. v. Lee,* 58 Wash. 16, 107 Pac. 870.

"It is now equally well settled in this state that the ·status of the property is fixed at the time of the pur-·chase and that, if the husband and wife unite in a promissory note secured by a mortgage, payable direct ·to their grantor as a part of the purchase price, or, by the same means, borrow the money to be used in payment from a third party, in either such event the money ·borrowed becomes community property, and to that ·extent the purchased property is community property. *Katterhagen v. Meister,* 75 Wash. 112, 134 Pac. 673, and ·cases there cited. An apparent exception to the latter part of this rule, as is pointed out in *Finn v. Finn,* 106 Wash. 137, 179 Pac. 103, arises when the spouse who furnishes the separate consideration for the purchase raises or secures the remainder of the purchase price ·by a mortgage upon separate property theretofore ·owned by such spouse, thus clearly making the debt

a separate one, even though the other spouse may be required to join in the note and mortgage to satisfy the lender."

In *In re Kuhn's Estate,* 132 Wash. 678, 233 Pac. 293, we held that, since an executory contract for the sale of real estate creates no title, legal or equitable, in the vendee, property held thereunder and not paid for at the time of the death of the wife, is not community property. We said:

"There is no doubt that the court erred in holding that the real estate was the community property of the deceased and the children of his first wife. We have so held in a long line of decisions announcing the principle that such a contract, while it remains executory and forfeitable, creates no interest in the land in the vendee, and that he has no legal or equitable title to, or interest in, the land until the contract has been fully performed. *Churchill v. Ackerman,* 22 Wash. 227, 60 Pac. 406; *Younkman v. Hillman,* 53 Wash. 661, 102 Pac. 773; *Tieton Hotel Co. v. Manheim,* 75 Wash. 641, 135 Pac. 658; *Converse v. LaBarge,* 92 Wash. 282, 158 Pac. 958; *Schaefer v. Gregory Co.,* 112 Wash. 408, 192 Pac. 968.

"Respondent relies largely upon the decision of this court in *Ahern v. Ahern,* 31 Wash. 334, 71 Pac. 1023, 96 Am. St. 912, where this court held that the title was acquired by the community. But in that case everything had been done to earn the title. As was stated in the case, the community had done all the law required it to do, and equitable title had vested, which is not true in the case at bar. The community had paid only $300 of the consideration of $1,200 to be paid for the land. At the most the community had an interest only in the $300, which would be represented by the sum of $150. Of the remaining $900 which was paid for the land, decedent paid it, and therefore he acquired the property as separate estate. Decedent and the children of his first wife were not tenants in common in anything. No equitable title had been acquired by decedent and the heirs of his first wife to the real estate. There was no title of any kind, either legal or equitable,

to the real estate when the first wife died. Hence the remaining portion of the purchase price paid by decedent and the amount paid for improvements were part and parcel of his separate estate."

In *Norman v. Levenhagen,* 142 Wash. 372, 253 Pac. 113, we held that, an executory contract for the purchase of real estate by a community being personal property, the husband's quitclaim in good faith of the community interest to his wife, before any judgment lien is secured by a community creditor, makes it her separate property, which such creditor cannot follow. We said, citing with approval *In re Kuhn's Estate, supra,* to the effect that an executory contract for the purchase of real property vests no title in the contract purchaser, that

"It is the settled doctrine of this court that the status of property, as to being community or separate, is to be determined as of the date of its acquisition. If the property is community or separate when acquired, it maintains that status until changed by the acts of the parties composing the community, by the operation of law, or by facts working an estoppel. See *In re Brown's Estate,* 124 Wash. 273, 214 Pac. 10, where our prior cases so holding will be found collected.

"It is the settled doctrine of this court, also, that an executory contract for the purchase of real property vests no title in the contract purchaser, either legal or equitable, until the contract is fully performed. *Schaefer v. Gregory Co.,* 112 Wash. 408, 192 Pac. 968; *Ashford v. Reese,* 132 Wash. 649, 233 Pac. 29; *In re Kuhn's Estate,* 132 Wash. 678, 233 Pac. 293."

In *Walker v. Fowler, supra,* we held that, where a wife took title to real property, purchased with a down payment from her separate estate, with the note and mortgage of the husband and wife for the balance, the status of the property was fixed at that time as her separate property to the extent of her payment and community property as to the balance. Our attention

was called to a statement in *Riverside Finance Co. v. Griffith*, 140 Wash. 322, 248 Pac. 786, to the effect that the circumstance that, in purchasing a piece of real property acquired by the husband after the sale of a private business owned by him in his own separate right, a mortgage was given signed by both himself and his wife to the vendor for a portion of the purchase price, did not render the property community property. We said:

"To the extent that the statement embraces that portion of the property represented by the amount of the purchase money mortgage, we are satisfied it is at variance with our earlier cases referred to herein, out of harmony with our subsequent case of *In re Parker's Estate* [153 Wash. 392, 279 Pac. 599], *supra,* and is hereby overruled."

The northeast quarter of section sixteen was farmed by tenants of Binge before he married appellant. The land produced an average minimum of twenty-five bushels of wheat an acre, of which Binge received two-fifths delivered in the warehouse; that is, the share of deceased was approximately eight hundred bushels of wheat per annum. Counsel for respondents argue from this that, even if Binge had not used any of the income from the southeast quarter of section thirteen—his separate property—or from the half section of land in Canada owned by him, or from land leased from the Marshall Field estate, this tract of land itself (northeast quarter of section sixteen) produced sufficient wheat over the years to pay the contract in full. It is urged that, as the land was purchased by Binge prior to his marriage, the land, together with the rents, issues, and profits from the land, were Binge's separate property; that, as there is no evidence that any community funds were used to pay the balance of the purchase price, and as the presumption is not rebutted that the charges against his separate property were paid out

of separate income, of which Binge had ample, there is no reasonable question concerning separate character of this section of land. *Guye v. Guye,* 63 Wash. 340, 115 Pac. 731, 37 L. R. A. (N. S.) 186, is cited as sustaining authority.

In *Guye v. Guye, supra,* we held that the natural enhancement in value during marriage of the separate property of the spouses is not property acquired during marriage, within the spirit of the community property law, which provides that property acquired before marriage and in certain ways, together with the rents, issues, and profits thereof, shall be the separate property of the spouse acquiring it, and that all other property acquired after marriage shall be community property. We held, respecting the controversy as to the second class of land, that, where the husband purchased land, took possession, made improvements, and paid at least part of the purchase price before marriage, it is his separate property, although he received the deed after marriage, in the absence of a showing that community funds entered into the purchase; that, where the husband has separate income, it can not be presumed that taxes on his separate property during marriage were paid with community funds; that it will be presumed that property once shown to be separate property continued to be such until the contrary is made to appear; and that the joinder of husband and wife in a mortgage of real estate is not evidence that the property is community property. We said:

"The tract of land forming the second class, as classified by counsel, was purchased from the executors of the estate of Charles C. Terry. The record shows that Charles C. Terry died February 17, 1867; that he left a will in which he named Franklin Mathias and Erasmus Smithers as executors, with power to sell and convey the real estate of which he died siezed, at such times, at such prices, and on such terms as the executors

should deem wise; that pursuant to the power conferred by the will, the executors sold the lot of which the tract now in question is a part to Francis M. Guye and one Charles Burnett on March 20, 1870, some two years prior to the marriage of Francis M. Guye to the appellant; that thereafter the lot was divided between the purchasers, Francis M. Guye taking the west half; that Guye took possession of the land awarded him, erected buildings thereon and otherwise improved the same; that he subsequently rented the same to tenants and collected rents therefrom, all prior to his marriage with the appellant; that a deed to the property was made by the executors January 7, 1873, nearly one year after the marriage of Francis M. Guye and the appellant; that some two years later a return to the probate court was made by the executors of the sale, reciting that a sale of the property was had on March 29, 1870, to Guye and Burnett for $500, and asking that the sale be confirmed. The record made by the executors does not show when the purchase price of the lot was paid. Burnett, however, testified that the negotiations leading up to the purchase of the lot were transacted by Guye, and that some part of the purchase price was paid at the time of the purchase, but whether all or not he did not remember. There was no evidence of any other payment.

"The appellant bases her claim of a community interest in this tract on the fact that the deed to the same passed after her marriage with Guye, and the presumption, arising from the manner in which business is ordinarily conducted, that the purchase price was paid at the time the deed was delivered. But we cannot think this a just deduction from the facts shown. Clearly, Guye had a valid subsisting interest in this property at the time of his marriage. He had taken possession of it and improved it, and paid a part at least of the purchase price. Had it been shown that the balance of the purchase price had been paid with community funds after the marriage, it might well be that, under the doctrine of *Heintz v. Brown,* 46 Wash. 387, 90 Pac. 211, 123 Am. St. 937, the property would have been community property 'to the extent and in the proportion that the consideration is furnished by the com-

munity, the spouse supplying the separate funds having a separate interest in the property in proportion to the amount of his or her investment,' but clearly, the entire property could not be community property. But there is no evidence in the record that community funds entered into the purchase price of the property. Therefore, for the want of some rule with which to measure such interest, if for no other, the court cannot hold that the community had any interest in this property.

"The appellant calls attention to the fact that, during the forty years of her married life with Francis M. Guye, large sums were paid in taxes on this separate property, and she asks the court to presume that the money with which they were paid was community funds, and to charge the land with one-half thereof for her benefit. But we cannot presume that the funds used to pay the taxes were community funds. What would have been the rule had it been shown that the husband had no separate income with which to pay these taxes, we do not need to discuss; but where, as here, it is shown that he did have such separate income, there can be no presumption that he used community funds for the purpose of paying his separate debts. The presumption is always in favor of honesty and fair dealing, rather than to the contrary. Moreover, the right of the spouses in their separate property is as sacred as is the right in their community property, and when it is once made to appear that property was once of a separate character, it will be presumed that it maintains that character until some direct and positive evidence to the contrary is made to appear.

"Nor do we think the fact that the spouses have joined in mortgaging property sufficient evidence on which to found a claim that the property mortgaged is community property. While the statute allows a husband or wife to sell and encumber his or her separate property, yet no prudent purchaser or mortgagee will ever take the separate deed or mortgage of a married man or married woman even when the other spouse sits by and disclaims interest. Such a deed or mortgage always requires explanation in subsequent dealings with the property whenever either of them

forms a part of the chain of title, rendering the property less easy of disposition than it otherwise would be. The fact that both spouses joined in the encumbrances put on the property in this instance is, therefore, little or no evidence that the property was community rather than separate property."

In *Morse v. Johnson,* 88 Wash. 57, 152 Pac. 677, we held that real property purchased on contract, and part of the purchase price paid therefor, by a man before marriage, who obtained a deed after marriage by paying the balance of the purchase price from his own funds and from money borrowed on the security of the property, is the separate property of the husband. We also held that the status of the separate property of the husband is not affected by the erection of buildings and the payment of the balance of the purchase price after marriage, where the rentals of the property alone had turned back more than sufficient to pay the balance of the purchase price and the cost of the improvements and upkeep, and there was no clear and convincing evidence establishing any community interest or the extent thereof. We further held that an advancement to another for the purchase price of real property, in consideration of marriage, does not make the property then acquired the community property of the parties after their marriage. In the course of our opinion, we said:

"It is plain that the real property mentioned was the separate property of W. A. Morse from the time of its acquisition by him up to the time of his marriage, and it is equally plain that the marriage did not in itself change its status in that respect. If, therefore, it has since become the community property of himself and his wife, it is because of the manner in which the parties have dealt with the property since their marriage. We said in the case of *In re Deschamps' Estate,* 77 Wash. 514, 137 Pac. 1009, that the status of property is fixed at the time of its purchase, and remains so fixed

unless changed by deed, by due process of law, or by the working of some form of estoppel. The appellants, in recognition of this rule, sought to show that the property had been divested of its separate character, by evidence tending to prove that they had erected buildings on the lots, had paid the note outstanding for the purchase price at the time of their marriage, and had met the cost of the upkeep of the property from the rentals of the property and from moneys earned by them after the marriage which they had intermingled with the earnings of the property. But it was shown that the property had in rentals alone turned back into the fund more than sufficient to pay the remainder of the purchase price and the costs of the improvements and upkeep, and that, in addition thereto, the appellants had mortgaged the property for an even greater sum, and had used the money so obtained largely in the purchase of other real property.

"It is our opinion that these facts do not justify us in holding that the community has any interest in the real property in question. Since it was originally the separate property of the husband, and since its status in this respect has not been changed by deed, or due process of law, the utmost interest the community could have therein would be some proportion thereof less than the whole. But this proportion is not definitely defined in the evidence."

In *Mattson v. Mattson*, 29 Wash. 417, 69 Pac. 1087, we held that the presumption that lands purchased by the husband during coverture are community property is overcome, where it is shown that his earnings during coverture were barely sufficient to support his family, and that he had separate property in the form of cash more than sufficient to pay the price of lands so acquired.

In *Guye v. Guye*, 63 Wash. 340, 115 Pac. 731, 37 L. R. A. (N. S.) 186, we held that the laws relating to the acquisition from the United States of mines containing precious metals are similar to those relating to the acquisition of timber and coal lands; that either spouse

may make entry upon them and acquire a full title from the United States without aid or intervention of the other, and that such property is the separate property of the locator and not the community property of the husband and wife. The author of McKay on Community Property pertinently inquires:

"Is it the law that property is separate because either spouse acquired it without the aid of the other? Does the fact that the husband or wife alone may take every step in the acquisition of property make it his or hers separately? Is it true that the husband may spend his life in searching for locations containing the precious metals and after he has found them give them away to a stranger, devise them, if you please, to his mistress and leave nothing to his wife? If such is the law what has become of the statute defining separate and common property?" McKay on Community Property (2d ed.), § 510.

In the following language, the author criticizes that phase of our opinion as being based on a misinterpretation of the Federal statute:

"The case of *Guye v. Guye* brings into the discussion a new extra-legal test of separate and community property that deserves serious consideration. The court says: 'Under the homestead and pre-emption acts, but one entry was allowed to a family, which must be made by the head of the family, and it was required that the family live on the land and make a certain amount of improvements thereon before final proof could be made. The land was granted ostensibly for the benefit of the family. . . . The court makes these things, assumed to be true of grants under the homestead and pre-emption laws, tests of the community character of such grants. These tests put aside the tests formulated by the law of separate and community property and substitutes others outside the law and not recognized by the law. If a grant is acquired by a married man under either of these laws, the test formulated by the law as to its separate or common character is not as stated by the court; the proper test is whether

the conveyance is a gift to the husband or a purchase for a consideration given by the community or by him separately. The test put forward by the court obscures the real question and applies a false test.

"In framing this new extra-legal test of community property does the court fairly state the essentials of the homestead and pre-emption law? Does not the court seize upon the mere accidents of the law rather than upon its essential elements? The court says: 'Under the. homestead and pre-emption acts but one entry is allowed to a family.' As a matter of law the entry is not made by a family nor on account of a family, except in the loose broad sense that every acquisition separate or common made by a married man is made for the benefit of his wife and family, and in this broad loose sense is just as true of his separate as of his community acquisitions. As the court says, 'which (entry) must be made by the head of the family.' The law does not require that the entry be made by the head of a family. Any person married or single, and whether the head of a family or not, twenty-one years of age, a citizen of the United States, or who has declared his intention to become a citizen, and has not applied for land under the act may make an application to purchase. Again says the court: 'And it was required that the family live on the land.' Why? The law requires the applicant to live upon the land and the land must be the place of his *bona fide* residence. If he is married and his wife resides elsewhere than with him on the land, it raises a question of the actuality and good faith of his residence. And he is required to make improvements to establish the good faith and actuality of his residence. The law of homesteads and pre-emption does not attempt to transfer any interest or right to the wife or any other member of the family. The grant is not ostensibly nor in law to the wife nor for the benefit of the family. The only rights which either the wife or the other members of the family secure because of such a grant are obtained not through the federal law of the grant, but entirely through state law operating upon the property after the grant has become effective and the property passed

from under the domain of federal law, and under the domain of state law.

"Another extra-legal test of separate property was put forward by the court in *Guye v. Guye*; it is contained in these words: 'Under the timber land acts no settlement upon or living upon the lands was required. The entryman was required to take an oath that he had made no other application under the act; that he did not apply to purchase the land for speculation, but for his own use and benefit; and that he had not made any agreement, directly or indirectly in any way or manner with any person or persons whomsoever by which the title he should acquire would inure to the benefit of any person other than himself. Each of the spouses could make such an entry, and there was nothing in the act itself which indicated a purpose to grant the land as a place of residence of the individual making the entry.'

"These things, all combined, do not under the law of separate and community property justify any court in ruling that property, the acquisition of which was attended by these incidents, is separate. These incidents may all be true of a parcel of property, and yet under the law it may be common." McKay on Community Property (2d ed.), § 513.

In *Teynor v. Heible*, 74 Wash. 222, 133 Pac. 1, 46 L. R. A. (N. S.) 1033, we held that, where a single man made homestead entry upon public lands and subsequently married, and thereafter patent issued to him, the land became his separate property. In conceding the disharmony of our own cases, we said:

"The first question suggested by the records relates, therefore, to the nature of the title acquired by Peter Teynor in virtue of his homestead entry. Did the land become, on his acquisition of the title thereto, his separate property, or did it become the community property of himself and his then wife, the appellant in this proceeding?

"On the question, our own cases are out of harmony. Indeed, they seem incapable of being reconciled, whether considered with relation to the facts upon which they are founded or with relation to the reasons

by which they are thought to be sustained. The cases in which the question of the nature of the title acquired by a homestead entry from the United States is considered are the following: [Cases cited.] . . .

"In other words, the rule should be that in all cases where the marital relation does not exist at the time of the original settlement and entry, and continue until final proof is made, the property should be held to be the separate property of the spouse who finally acquires the patent to the land."

We held in *Card v. Cerini*, 86 Wash. 419, 150 Pac. 610, following *Teynor v. Heible, supra,* that lands patented to a married man who made homestead entry while single, are his separate property.

▇ It is the rule in this state that the status of property, whether real or personal, becomes fixed as of the date of its purchase or acquisition; and that the status, when once fixed, retains its character until changed by agreement of the parties or operation of law. Property acquired through contractual obligation, as between husband and wife and all others claiming under them, has its origin and is acquired as of the date when the obligation becomes binding, and not as of the time when the money is paid or the thing is delivered or conveyed. The fruit of the obligation is legally acquired as of the date when the obligation becomes binding.

▇ Where property is acquired during marriage, the test of its separate or community character is whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof; the presumption, which may be rebutted by proof, being that it is community property. If the husband and wife unite in a promissory note secured by mortgage, payable to their grantor as a part of the purchase price, or, by the same means, borrow the money to be used in payment from a third party, in either event the money borrowed becomes com-

munity property, and to that extent the purchased property is community property.

■ ■ By statute in this state, "rents, issues and profits" of separate property are separate property. These terms have come to have a reasonably well fixed meaning in the law; and so long as the property in question is either "rents, issues or profits" of separate property, it is separate by statute, and the question ends. It is only when the property in question is produced by the efforts of the spouses, in some way aided by separate capital, that there is any question. In short, the community factor must make of the product something more than "rents, issues and profits" of separate property. When it is made to appear that property was once of a separate character, it will be presumed that it maintains that character until some direct and positive evidence to the contrary is made to appear. Where a husband has separate income, it is presumed that charges against his separate property are paid out of such income.

"Where the husband has in his possession both community and separate funds, the presumption is that he pays debts from the fund from which properly they should be met." *In re Finn's Estate,* 106 Wash. 137, 179 Pac. 103.

See, also, *In re Woodburn's Estate,* 190 Wash. 141, 66 P. (2d) 1138.

■ If part ($920) of the purchase price of the first tract of land in controversy was from the husband's separate funds, and the balance of $5,904 had been paid from community funds, to the extent of $920 the tract would be separate property of the husband, and the balance of $5,904 would represent the interest of the community in that section of land. There is no evidence, however, of the application of community funds to payment of the balance of the purchase price; there-

fore, under the above-recited rules, we can not hold that the community had any interest in this property. Also, there is proof that the balance of the purchase price was paid out of Binge's separate income.

(2) Counsel for appellant merely state, respecting the second tract in controversy, that "the record is clear concerning the southeast quarter of section thirteen." No argument is advanced. *The record is clear* concerning this tract of land.

Binge bought this land and paid for it January 21, 1908, more than five years prior to his marriage to appellant. Its status as separate property was never changed by deed, by due process of law, or by the working of some form of estoppel. The two mortgages, aggregating five thousand dollars, placed on the property by Binge in October 1915, did not change the status of the property from separate to community property. The notes and mortgages were made after the marriage, but same were not signed by appellant. The mortgages were not intended to be a community obligation, and clearly, under the evidence, they were not a community obligation. The community, as such, contributed nothing towards the acquisition or operation of this section of land. The presumption that Binge paid the mortgages against his separate property out of his separate income has not been overcome; in fact, the evidence sustains the trial court's holding that the mortgages were paid out of Binge's separate income.

"Where a husband has separate income, it is presumed that charges against his separate property are paid out of such income." *In re Woodburn's Estate,* 190 Wash. 141, 66 P. (2d) 1138.

The facts in *In re Woodburn's Estate,* 190 Wash. 141, 66 P. (2d) 1138, are as follows: The Woodburns were married in 1887. Two years prior thereto, the deceased

husband acquired title to the property in question, paying therefor three hundred dollars. The widow testified that the entire purchase price had not been paid at the time of the marriage; that fifty dollars given to her by her father went into the purchase price. The tract was swamp land, on which the Woodburns went to live shortly after their marriage, and they resided thereon for some years, during which period, and a period subsequent to the time they moved from that property, the land was gradually brought into a tillable condition by clearing and draining. Mrs. Woodburn owned sixty-six acres of land as her separate property. No segregation was made of the proceeds from either piece of property. There was a substantial income from these properties. The real and personal property acquired after marriage was all inventoried as, and conceded to be, community property.

We held that, in view of the commingling of the income from the separate property, it could hardly be contended that property purchased with their combined funds did not become community property, but that it did not follow that the status of the separate property—the property purchased by the husband in 1885 prior to his marriage—was changed; that the separate character impressed on the property by its date of acquisition was never lost; and that the testimony of Mrs. Woodburn that payments on the purchase price were made during coverture out of community and her separate funds was not persuasive, in face of the fact that her husband acquired title two years before the Woodburns were married. We said:

"For the status of property is to be determined as of the date of its acquisition. *Katterhagen v. Meister,* 75 Wash. 112, 134 Pac. 673; *Folsom v. Folsom,* 106 Wash. 315, 179 Pac. 847. When the separate status of property is once established, the presumption continues until changed by deed, due process of law, or some form

of estoppel. *In re Sanderson's Estate*, 118 Wash. 250, 203 Pac. 75. And the burden is upon the person claiming it to have changed to establish the fact. *Guye v. Guye*, 63 Wash. 340, 115 Pac. 731, 37 L. R. A. (N. S.) 186. Nor does an enhancement in value during coverture affect its separate status (*Guye v. Guye, supra*), unless by the use of community funds in a substantial amount the property is acquired or enhanced in value. *Worthington v. Crapser*, 63 Wash. 380, 115 Pac. 849; *Jacobs v. Hoitt*, 119 Wash. 283, 205 Pac. 414. . . .

"The fact that the income from their separate property was commingled raises no presumption that community funds were used in the payment of taxes and assessments. On the contrary, where a husband has separate income, it is presumed that charges against his separate property are paid out of such income. *Guye v. Guye, supra; In re Finn's Estate*, 106 Wash. 137, 179 Pac. 103."

█ (3) Counsel for appellant contend that the third tract ("Marshall Field" land) was acquired subsequent to the marriage of Binge to appellant; hence, it will be presumed that it is community property, a presumption respondents have not overcome. *Katterhagen v. Meister*, 75 Wash. 112, 134 Pac. 673, which quotes the applicable rule followed in *United States Fidelity & Guaranty Co. v. Lee*, 58 Wash. 16, 107 Pac. 870, is cited as sustaining authority.

In *United States Fidelity & Guaranty Co. v. Lee, supra*, the wife furnished all of the money for the purchase of the land in question. The case simply involved the rights of a creditor between the parties themselves. We said:

"The presumption is that property acquired during the marital relation is community property, but this presumption may be rebutted. *Weymouth v. Sawtelle*, 14 Wash. 32, 44 Pac. 109; *Brookman v. State Ins. Co.*, 18 Wash. 308, 51 Pac. 395. This presumption has been met and clearly overcome in this case. The case of *Heintz v. Brown*, 46 Wash. 387, 90 Pac. 211, 123 Am.

St. 937, was thought by the trial court to control this case. That case and the authorities therein cited are relied upon by the respondent for an affirmance of the judgment rendered in this case. In that case we said:

" 'From the foregoing statement it will be seen that the property acquired from the railway company and the mortgage company was paid for in part by the separate funds of the wife and in part by money borrowed on the property in which she had invested her separate funds. Under the rule announced by this court in *Yesler v. Hochstettler,* 3 Wash. 349, 30 Pac. 398, and reaffirmed on rehearing in *Main v. Scholl,* 20 Wash. 201, 54 Pac. 1125, the funds borrowed by the wife, even though borrowed on her separate property, or on property in which she had invested her separate funds, was community property, and to that extent at least the property in controversy was paid for with community funds and became community property.'

"We do not desire to further extend the rule announced in that case. In that case, and in the cases from this court there followed, the separate estates were not sufficient to make the purchases, and the credit of the community was drawn upon to complete the purchases. Money was actually borrowed and used for that purpose, so that a community obligation was created and a resulting community interest followed. The property thus purchased was not acquired by separate property, or the rents, issues, and profits thereof. In the case at bar the appellant borrowed no money. Her separate estate was amply sufficient to meet the whole contract at the time it was entered into. She was not required to create a community obligation, and did not intend to do so. She entered into a contract which her separate estate was sufficient to protect, and which she partly performed with separate funds, and without doubt intended to carry out as her separate contract without community liability. In these respects this case is distinguishable from *Heintz v. Brown, supra.* If we apply the rule in that case to the facts in this case, we must hold that married persons may not purchase property as separate property, except for cash, and may not make contracts and incur

liability to the same extent as though unmarried, which is squarely in the face of the statutes above quoted. Where property is acquired during marriage, the test of its separate or community character is whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof; the presumption always being that it is community property, but this presumption may be rebutted by proof. Tested by this rule, we are satisfied that the property in question here was wholly the separate property of the appellant. We are therefore of the opinion that the contract in this case created no community obligation which would necessarily take the case within the rule of the *Heintz* case."

In *Dobbins v. Dexter Horton & Co.*, 62 Wash. 423, 113 Pac. 1088, which supports respondents' position, we held that the fact that the husband joined in a note and mortgage upon real estate purchased, and most of the purchase price was paid by the wife before marriage, does not make the property or the proceeds therefrom community property. In the case at bar, the separate property of Binge was mortgaged by him to obtain the fund of five thousand dollars with which the "Marshall Field" land was purchased. We said, in *Dobbins v. Dexter Horton & Co., supra:*

"It is contended that the execution of the note and mortgage upon the Aberdeen property by both the husband and wife, and the use of the proceeds of that loan to pay a balance due upon the purchase price of that property and to improve the same by building a dwelling thereon, rendered it community property. The case of *Heintz v. Brown*, 46 Wash. 387, 90 Pac. 211, 123 Am. St. 937, may seem to lend support to this view. We think, however, that case is distinguishable from this. In that case the contract for the purchase of the land was made after marriage, while in this case it was made before marriage. In that case the contract was made presumably in the interests of the community, while the contract in this case, of course, was not so made, because there was then no community. In that

case we are to presume that the community paid the loan which produced the money to pay for the land, and hence, the community did actually contribute to the purchase price; while in this case the community did not so contribute, but the whole of the loan was actually paid from the separate funds of the wife. In that case the community actually assisted in carrying out a contract for the purchase of land entered into after marriage, while in this case the husband only joined in the execution of a note and mortgage, thereby assisting in the carrying out of the contract for the purchase of the Aberdeen property, which contract had been made before marriage, and to the payment of which loan neither the husband nor the community ever contributed anything. We think it can be said in this case that the wife's separate funds actually produced all of these properties, notwithstanding there may possibly be a technical sense in which it could be said the loan, evidenced by the note and mortgage executed by both husband and wife, contributed to the acquisition of the Aberdeen property. We treat the question as though no rights were here involved except those of the husband and wife, so far as that property is concerned, since appellant's rights did not arise until years afterwards. We are of the opinion that the husband acquired no interest in that property.

"It may be said that the assumption by respondent of the mortgage on the Eighteenth avenue place, and the assumption of the mortgage upon the property here involved, had the effect of creating a community obligation in the acquisition of those properties. We think such is not the case, in view of the evidence showing that those transactions were consummated as a part of the management of her separate property."

In *In re Parker's Estate,* 153 Wash. 392, 279 Pac. 599, we held that, where real property was purchased after marriage by a payment from the separate funds of the wife, with a note and mortgage of husband and wife given for the balance, to that extent the status of the property was fixed at that time as community prop-

erty. We said, respecting *Dobbins v. Dexter Horton & Co., supra:*

"In the case of *Dobbins v. Dexter Horton & Co.,* 62 Wash. 423, 113 Pac. 1088, the purchaser of the property at the time of its purchase was an unmarried woman. Subsequently she was married and she and her husband executed a mortgage, a part of the proceeds of which went into the property. The distinction between that case and the one now before us is that there the credit of the community was not pledged by the husband and wife at the time of the purchase and as a part of the consideration therefor."

In *In re Brown's Estate,* 124 Wash. 273, 277, 214 Pac. 10, we said:

"In relation to items 1, 2, 3, 5 and 6, the testimony shows that all this property was acquired during coverture, and there is an absence of proof concerning its origin or the source of the money with which it was procured. The presumption therefore attaches that it is community property, and there being no evidence to overcome that presumption, we come to the conclusion that this is community property and, as such, the appellant is entitled to her community interest therein. *Jacobs v. Hoitt, supra.*"

In *Murphy v. Neylon,* 46 Wash. 574, 90 Pac. 916, we held that recitals in a deed to a husband to the effect that the land was his separate property, do not affect the community character of the land where it was purchased with community funds and the wife was unaware of the recitals.

In *In re Curtis' Estate,* 116 Wash. 237, 199 Pac. 309, we held that the presumption of the community character of property acquired during coverture is not overcome by a showing that the separate property and the community earnings of the spouses were commingled in the acquisition of what is claimed as community property.

In *In re Finn's Estate,* 106 Wash. 137, 179 Pac. 103,

we held that, where property was purchased and part payment made thereon by a wife with *separate funds,* and the *balance secured by* a joint note and *mortgage upon* her *separate property,* its status as her separate property is fixed at that time, and the presumption that it was community property is overcome, although subsequently community funds were used in paying the obligation, where there was no intention as between husband and wife to change the original status of the property. We said, in reviewing prior cases and emphasizing the rule that, where one spouse borrows money upon the pledge of separate property and uses that money for the purpose of acquiring and completing the purchase of property, that does not, of itself, make the property ·so acquired community property:

"The appellant bases her claim that these tracts are hers separately upon the fact that, at the time they were procured, her separate credit was used to obtain the funds which made the initial payments. The claim of the respondents is that the property was community property for the reason that it was ultimately paid for by community funds. The testimony shows that William C. Finn owned one tract of land in his own name, but was engaged in extensive farming operations upon property which he leased on shares, and included in his operations were the tracts here involved. The appellant's witnesses testify that Finn, at all times, recognized the tracts here in controversy as being his wife's property, and referred to them as such, and an effort was made to show that the rental which she was entitled to for that property, but which had not been paid to her by her husband, was used by him in retiring the indebtedness which she had created in making the purchases.

"There will be no presumption indulged in that this indebtedness was paid out of community funds, but where the husband has in his possession both community and separate funds, the presumption is that he pays debts from the fund from which properly they should be met. *Guye v. Guye,* 63 Wash. 340, 115 Pac.

731, 37 L. R. A. (N. S.) 186. We are of the opinion, however, from the testimony, that her share of the crops raised upon the property was not sufficient to have created any such funds during the years in which it was operated by her husband, and that those crops were not more than sufficient to have paid the taxes and interest during that time, and that the funds which ultimately paid off the indebtedness were community funds created by the husband in his general community operations. These facts, then, present to us the question as to whether the status of the property is to be fixed as of the time of its acquisition or is to be determined by the nature of the funds which ultimately pay off the obligations originally incurred to acquire such property. An interesting argument can be made in support of either view, but, as we take it, the question is foreclosed by our decisions in the cases of *Katterhagen v. Meister,* 75 Wash. 112, 134 Pac. 673; *In re Deschamps' Estate,* 77 Wash. 514, 137 Pac. 1009; *Morse v. Johnson,* 88 Wash. 57, 152 Pac. 677; *Graves v. Columbia Underwriters,* 93 Wash. 196, 160 Pac. 436. In the *Katterhagen v. Meister* case, above, it is said:

" 'He paid $1,600 upon the purchase price from his separate funds. To that extent the property was separate. The remainder, or $5,050, was paid by the community. When the husband and wife united in the promissory note, the debt created was a community debt, and the money borrowed upon the note belonged to the community. It is not material whether they borrowed the money of a third party and paid it to the vendor or gave their note direct to him as a part of the purchase price. The rule would be the same in either case. Nor does the fact that the husband later paid the note out of his separate funds change the situation. The status of the property was fixed at the time of the purchase.'

"In this case, so far as the Lucille Dawson tract is concerned, we may say that the appellant paid $400 upon the purchase price from her separate funds; to that extent the property was separate, the remainder, of $1,000 was paid by the community. When she gave her separate promissory note, the debt created was a separate debt and the money borrowed upon the note

belonged to her separately. This money was borrowed from a third party, and the fact that her husband later paid off the note by substituting a note signed by both, and that later the note was paid out of the community funds, does not change the situation; the status of the property, so far as the payments made thereon were concerned, was fixed at the time of purchase. The presumption that property acquired during coverture is community property is not overcome as to the share of the property represented by the $1,000 mortgage; no community credit or property was used in securing the share; in fact, the presumption is aided by the fact that community funds were used in paying the mortgage and to that extent this tract must be held to be the property of the community. The reason for this result appears more fully later in this opinion where we deal with the Will Drew tract. The obligation to pay the remaining $600 being solely the appellant's, it follows that one-half of the Lucille Dawson tract is the appellant's separate estate and one-half is community property.

"In reference to Will Drew tract, $420 of the $1,320 purchase price was obtained upon the strength of the appellant's separate estate, and to that extent the property acquired by her was her separate property, although later the obligation which she assumed may have been liquidated out of the community funds, but the $900 balance of the purchase price was obtained upon a note signed by both members of the community. This note was secured by a mortgage upon the appellant's separate property. It is true that the husband became a joint maker of the note because of the mortgage company's refusal to advance the money to the wife upon her sole signature.

"The cases of *Yesler v. Hochstettler*, 4 Wash. 349, 30 Pac. 398; *Main v. Scholl*, 20 Wash. 201, 54 Pac. 1125, and *Heintz v. Brown*, 46 Wash. 387, 90 Pac. 211, 123 Am. St. 937, are cited to the point that funds borrowed by a wife, even though borrowed on her separate property or on property in which she had invested her separate funds, are community property; but this court in *United States Fidelity & Guaranty Co. v.*

*Lee,* 58 Wash. 16, 107 Pac. 870, referring to the *Heintz* case, says:

" 'We do not desire to further extend the rule announced in that case. In that case, and in the cases from this court there followed, the separate estates were not sufficient to make the purchases, and the credit of the community was drawn upon to complete the purchases. Money was actually borrowed and used for that purpose, so that a community obligation was created and a resulting community interest followed. The property thus purchased was not acquired by separate property, or the rents, issues, and profits thereof;'

and proceeds to demonstrate in the case then under consideration that the wife was not required to create a community obligation and did not intend to do so when she entered into the contract, and that she entered into a contract which she could amply protect from her separate estate, and distinguishes that case from the *Yesler, Main* and *Heintz* cases, laying down this rule:

" 'Where property is acquired during marriage, the test of its separate or community character is whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof; the presumption always being that it is community property, but this presumption may be rebutted by proof.'

"In *Dobbins v. Dexter Horton & Co.,* 62 Wash. 423, 113 Pac. 1088, the *Heintz* case was again distinguished, the court saying that in the *Heintz* case the contract was presumably in the interest of the community, while in the case then under consideration the community did not contribute but that the separate funds of the wife were exclusively used,

" 'notwithstanding there may possibly be a technical sense in which it could be said the loan, evidenced by the note and mortgage executed by both husband and wife, contributed to the acquisition of the Aberdeen property.'

"In *Graves v. Columbia Underwriters,* 93 Wash. 196, 160 Pac. 436, it was held that the husband joining in a note secured by a mortgage on his wife's separate

property, having been compelled to do so by the person loaning the money, did not make the money so obtained community property unless it was put to community uses; that, the wife being a married woman, the presumption is that property acquired during the marital relation would be community property, but that that presumption is a rebuttable one. So here, although by signing the note, the husband might have rendered himself liable to the payee, this was done as a matter of accommodation to the wife under the compulsion exercised by the lender; and, as between the husband and wife, the obligation created was not a community obligation but remained as it was originally intended, her separate obligation, although as to third parties the husband and wife would both have been liable had the mortgage security been waived and an action begun to collect upon the note itself. Where it cannot be said that community credit was called upon to asssist in the purchase of the property, and that, therefore, the community was not interested in the property, although subsequently community funds were used in paying the obligation evidenced by the note and mortgage, the rule is, as we have heretofore stated it, that the status of the property is to be determined as of the time of its acquisition. The early cases which might seem to indicate that money borrowed by one spouse upon the pledge of separate property becomes community property, it will be discovered, were cases which held, as is noted in cases thereafter decided, that, where the spouse borrows the money upon the pledge of separate property and uses that money for the purpose of acquiring and completing the purchase of property, that does not, of itself, make the property so acquired community property, but merely that the presumption is that property acquired during coverture is community property and that its separate status can be determined by satisfactory evidence. In the instant case, as concerns the Will Drew tract, we are satisfied that such evidence has been produced and that the presumption has been met and overcome; that there was no intention at the time the property was acquired to involve the community in any obligation for its purchase; the entire payment having been

made by money which the appellant secured on her personal liability and for which the community did not become liable except as to third parties."

If the property which furnished the fund is separate property (it was), and that fund is not (it was not) devoted to any community purpose, the fund retains its status as separate property. There was no joinder of appellant in the notes and mortgages on her husband's separate property. Even if Mumm, the lender mortgagee, had exacted such signature in an excess of precaution, such joinder would not have converted the money acquired thereby into a community fund, if it was in no way applied to community uses. *Graves v. Columbia Underwriters,* 93 Wash. 196, 160 Pac. 436.

While, we repeat, the presumption naturally arises that property acquired during the marital relation is community property, the presumption is a rebuttable one. To hold that a married man cannot, as in the case at bar, mortgage his separate property and use funds thereby obtained to purchase other separate property, making payments on the mortgage of the one and purchase price of the other from the rents, issues, and profits of his separate property, would be to nullify the statute (Rem. Rev. Stat., § 6890) which permits him to make contracts and incur liability with respect to his separate property the same as if he were unmarried.

The presumption that the property acquired during marriage is community property has been rebutted by respondents. The evidence is clear that the "Marshall Field" land was acquired by Binge with his separate funds and the rents, issues, and profits from Binge's separate property. Binge did not perform any work after his marriage in actual farming operations. He and his wife did not reside on any of the farms. Only one bank account was kept, and that was in

Binge's name. There is no evidence that any money was placed into that bank account except the rents, issues, and profits from the lands from which Binge paid his taxes, installments due on land he was purchasing, and the living expenses of the marital community.

The court made no finding of the truth of appellant's statement that she gave to the community twelve hundred dollars when she was married and also added to the community funds one thousand dollars in 1926, which contributions, appellant insists, changed the status of the property of Binge from separate to community property.

If appellant made those contributions, she would not thereby acquire any interest in the property in controversy. She does not claim an equitable lien against the separate property of the deceased for her contributions of $2,200 to the community, nor does she make any claim of separate property on that account.

In *In re Deschamps' Estate*, 77 Wash. 514, 137 Pac. 1009, the wife owned an apartment house prior to her marriage. Her husband, after the marriage, paid out some of his own money in repairs and upkeep. He claimed this gave him a community interest in the property, notwithstanding the rule that the status of the property was fixed at the time it was purchased. We held that the status of the wife's separate real property was not affected by the fact that the husband put some of his money into it for repairs and upkeep, except as subject to a possible equity therefor which should be disregarded when the amount was small and was advanced without any understanding that it carried an interest in the property.

In the course of our opinion, we said:

"At the time of her marriage, Mrs. Deschamps was the owner of the Olympic Apartments, in Seattle,

Washington. Appellant claims that they were in bad condition, and that he paid out some of his own money in repairs and up-keep. This would not give him a community interest. The status of the property was fixed at the time it was purchased. *Katterhagen v. Meister*, 75 Wash. 112, 134 Pac. 673. It was in Mrs. Deschamps, and unless divested by deed, by due process of law, or the working of an estoppel, must remain there, subject to a possible equity, under the case of *Heintz v. Brown*, 46 Wash. 387, 90 Pac. 211, 123 Am. St. 937, as distinguished in *Dobbins v. Dexter Horton & Co.*, 62 Wash. 423, 113 Pac. 1088, and *United States Fid. & Guar. Co. v. Lee*, 58 Wash. 16, 107 Pac. 870, in which case the court said: 'We do not desire to extend the rule in that case.' The amount advanced, if any, was small, and entirely disproportionate to the value of the property and it nowhere appearing that it was advanced with the understanding on the part of either husband or wife that it carried an interest in the property, it ought to be disregarded under the rule of *Worthington v. Crapser*, 63 Wash. 380, 115 Pac. 849."

We cannot agree with counsel for appellant that it would be as fair to assume that the proceeds of five thousand dollars from the mortgages on section thirteen were lost in some of Binge's ventures—loan of two thousand dollars in 1912 or 1913 by Binge to one Coy, a loan of eight hundred dollars by Binge to another person during the existence of the marital community, and the purchase of mining stock in the amount of two thousand dollars, which loans were never paid and the mining stock was valueless—as to assume that the loan of five thousand dollars was used in the purchase of the "Marshall Field" land. In the first place, there is evidence, which the trial court accepted as true, of the application of the five thousand dollars to the purchase of the land, and there is no evidence from which it may reasonably be inferred that the money was lost in bad loans and mining ventures.

In *Legg v. Legg,* 34 Wash. 132, 75 Pac. 130, we held that, where a husband and wife by their joint efforts added nine hundred dollars in value to the husband's separate real property, upon the death of the husband without issue, the wife, as survivor of the community, was entitled to reimbursement from such separate estate to the value of the improvements made by the community. It appeared in that case that, from the time of their marriage and during a period of twenty-five years, the husband and wife had lived upon a forty acre tract of land which the husband had acquired, in its unimproved state, by patent issued prior to the time of the marriage; that the spouses had enhanced the value of the land in a substantial amount by their joint efforts in placing betterments thereon; and that, at the time of the death of the husband, the wife had no property of any kind except her community interest in the land. Upon that combination of considerations, this court concluded that the equities of the case called for the allowance to the wife of a lien upon the land to the extent of the value of the betterments placed thereon during the existence of the community, together with interest on the amount thus ascertained by the court. The reason inducing such holding by this court is that otherwise the husband, having the greater control over community affairs, could thereby deprive the wife of every particle of interest in the community property, in many instances leaving her destitute after years of effort in acquiring and conserving a community estate. Law and equity will cooperate to defeat such results.

The common law and the civil law authorities are in complete accord that the improvement of land passes no form of title to it nor interest in it. The utmost the improver can successfully claim is compensation. There is some dictum to the effect that the im-

provement of land imposes a lien upon it to secure compensation, but the weight of authority is against this doctrine, according to the authority of McKay on Community Property. Up to 1925, apparently all the cases decided where compensation for improvement on land was allowed arose in Texas, except one (*Legg v. Legg*, 34 Wash. 132, 75 Pac. 130) in this state, which followed the enunciation by the supreme court of the state of Texas.

In Texas, it is settled that a legal action to recover land is so far equitable in character that the plaintiff, though entitled to recover, may be compelled "to do equity" to the defendant. This enables the court to impose the equitable condition of making compensation for improvements. The broad, general, and liberal rule prevailing in Texas as to the recovery of compensation for improvements as between strangers doubtless influenced the courts to adopt a liberal rule as between married persons. The courts of Texas have not felt bound by strict rules, but have acted on broad principles of justice.

Under the rules stated above in the paragraph immediately preceding the closing paragraph in the discussion of the question of the status of the first tract of land, the trial court correctly held that the three tracts of land which are the subject matter of this controversy, were the separate property of the decedent, appellant's late husband.

(1) The ownership of the first tract was acquired by Binge through a contract for a conveyance antedating his marriage to appellant. There is ample evidence that, after his marriage, Binge paid the balance due on the purchase price out of funds which he was entitled under the law to hold as separate property.

(2) Binge owned the second tract of land prior to his marriage. The mortgage of five thousand dollars

subsequently placed on that separate property by its owner, Binge, was paid by that owner from funds which were the separate property of Binge.

(3) The proof is sufficient that Binge acquired the third tract of land through a legally recognized source of separate ownership. The consideration for the tract was furnished by Binge individually out of funds which he was entitled under the law to hold as separate property.

On this cross-appeal, respondents complain of that portion of the decree which set aside to appellant, in addition to the home (of the appraised value of two thousand dollars) and the furniture (appraised at two hundred dollars), as part of the homestead exemption, "also an eight hundred dollar interest in the separate estate of William F. P. Binge."

Respondents also assign as errors (1) the distribution to appellant of all personal property belonging to the estate, before making provision for the payment of debts and expenses of administration; and (2) direction that appellant be paid a family allowance of $125 monthly "from October 1, 1939, until the final termination and distribution of this estate."

The court approved the final report and account of the administratrix, which disclosed that, after payment of all claims against the estate, except inheritance tax and expenses of administration, there was a balance of cash on hand in the amount of $1,599.38; and that the personal property of the estate consisted of household furniture and equipment of the appraised value of two hundred dollars, nineteen shares of the capital stock of a warehouse company of the appraised value of $475, and five shares of the capital stock of a telephone company of the appraised value of ten dollars; that is, of the assets of the estate, the personal property was of the value of $2,284.38.

The court found that the estate was in condition to be closed, and that all debts and claims had been paid except attorney's fee, costs of administration, and inheritance tax. In the decree, the administratrix is allowed a fee of five hundred dollars, and her attorney is allowed a fee of seven hundred and fifty dollars.

 Under the statute (Rem. Rev. Stat., § 1341 [P. C. § 9847]), in view of the fact that the intestate left no issue nor was he survived by his father, mother, brothers, or sisters, his separate real property descended, subject to the debts of the estate, one-half to appellant, the decedent's surviving wife, and the other half to the nephews and nieces of the decedent.

The separate personal estate of which Binge died possessed should have been distributed, under the statute (Rem. Rev. Stat., § 1364 [P. C. § 9861]), as follows: Appellant widow is entitled to all articles of her apparel or ornament, according to the degree and estate of her husband, and such provisions and other necessaries, for the use of herself and family, as shall be allowed and ordered in pursuance of the provision of any law. The personal estate remaining after such allowance shall be applied to the payment of the debts of the deceased with the charges for the funeral and the settling of the estate. The residue, if any, of the personal estate should have been distributed to appellant widow.

 Upon the death of Binge, his widow was entitled to one-half of the community property, subject to the community debts. In view of the fact that he died intestate, the other half of the community property passed to the widow, as deceased died without issue, subject to the community debts, the family allowance, and the charges and expenses of administration. Rem. Rev. Stat., § 1342 [P. C. § 9848].

 The title of the decedent in the lands of which

he died seised vested immediately on his death in his heirs, subject to his debts, family allowance, expenses of administration, and any other charges for which such real estate is liable under existing laws. Rem. Rev. Stat., § 1366 [P. C. § 9863].

No homestead was claimed by the appellant, nor did the deceased during his life-time file a declaration of homestead in the manner provided by law either prior or subsequent to the death of the decedent. Upon petition in her final report, appellant petitioned the setting aside to her of certain property as her homestead. Under the statute (Rem. Rev. Stat., § 1473 [P. C. § 9893]), the court was authorized, after hearing and upon being satisfied that the funeral expenses, expenses of last sickness and of administration, had been paid or provision made therefor, to award and set off to the surviving spouse property of the estate either community or separate not exceeding the value of three thousand dollars, which property shall include the home and household goods, as a homestead. The judgment making that award vests in the widow the absolute title to that property, and thereafter there shall be no further administration upon that portion of the estate.

Inasmuch as the property set off as a homestead did not exceed the value of two thousand dollars, the widow was entitled to an award of additional property so that the value of the homestead, when added to the value of the other property, shall equal three thousand dollars. So far as pertinent, the statute (Rem. Rev. Stat., § 1474 [P. C. § 9894]), reads as follows:

". . . and upon being satisfied that the value thereof does not exceed two thousand dollars . . . the court, upon being satisfied that the funeral expenses, expenses of last sickness and of administration have been paid or provided for, shall set off and award to such survivor, other property, either separate or

community, not to exceed one thousand dollars ($1,000) in value, exclusive of all such liens. If the value of the homestead, exclusive of all such liens, be less than two thousand dollars ($2,000), the court shall set off and award additional property, either separate or community, in lieu of such deficiency, so that the value of the homestead, exclusive of all such liens, when added to the value of the other property awarded, exclusive of all such liens, shall equal three thousand dollars ($3,000). Said decree shall particularly describe the said homestead and other property so awarded, and such homestead and other property so awarded shall not be subject to further administration, and such decree shall be conclusive and final, except on appeal, and except for fraud, and such awards shall be in lieu of all further homestead rights and of all exemptions: . . ."

In addition to the awards provided by the statute, the court may make such further reasonable allowance of cash out of the estate as may be necessary for the maintenance of the family according to their circumstances during the progress of the settlement of the estate, and any such allowance shall be paid by the executor or administrator in preference to all other charges except funeral charges, expenses of last sickness, and expenses of administration. Rem. Rev. Stat., § 1476 [P. C. § 9896].

The personal assets must be first applied, and then the realty, to the payment of the debts of the decedent. Rem. Rev. Stat., § 1493 [P. C. § 9975], provides for sale of the personal property of the estate for the preservation of the property of the estate or for the payment of the debts of the estate or the expenses of administration, or for the purpose of discharging any obligation of the estate.

Rem. Rev. Stat., § 1494 [P. C. § 9976], provides that, whenever it shall appear to the satisfaction of the court that any portion or all of the real property should be

sold or mortgaged for the purpose of raising money to pay the debts and obligations of the estate and the expenses of administration, inheritance tax, or for the support of the family, the court may order the sale or mortgage of such portion of the property as appears to the court necessary for such purposes.

Under the statute (Rem. Rev. Stat., §§ 1474 and 1476), the allowance of eight hundred dollars interest in the separate estate of the decedent as part of appellant's homestead exemption constituted an indebtedness of the estate payable in regular order out of the assets of the estate. The court was without power to charge the estate distributed to the heirs— the nephews and nieces were entitled to one-half of the real estate which was the separate property of the decedent—with the lien in favor of the appellant. *Horton v. Barto,* 17 Wash. 675, 50 Pac. 587; *Huston v. Becker,* 15 Wash. 586, 47 Pac. 10; *In re Thompson's Estate,* 110 Wash. 635, 188 Pac. 784.

In the settlement of the estate, the claims should be satisfied, and the estate distributed free from any liens therefor. The debts of the deceased and the expenses of administration must be paid before distribution of the personal property can be made. The personal assets must be first applied and then the realty, as stated above, to the payment of the debts of the decedent.

In view of the amount involved, the family allowance by the court to the appellant was a reasonable sum and is sustained by the statute and our decisions. *In re Hooper's Estate,* 117 Wash. 463, 201 Pac. 740; *In re Schiffner's Estate,* 174 Wash. 134, 24 P. (2d) 434.

The judgment is affirmed on the appeal and reversed on cross-appeal, with direction to the trial court to pro-

508

ceed in conformity to pertinent provisions of the probate code.

BLAKE, C. J., MAIN, ROBINSON, and SIMPSON, JJ., concur.