[No. 28987. Department One. June 19, 1943.]

DECEIMA NESS, *Respondent,* v. WILLIAM L. BENDER *et al., Defendants,* WILLIAM L. BENDER, *Individually and as Executor, Appellant.*[1]

[1]Reported in 138 P. (2d) 864.

*Robert A. Devers,* for appellants.

*Jno. Mills Day* and *Arthur M. Harris,* for respondent.

MILLARD, J.—By his wife, Carrie, whom he married in 1890, Charles B. Bender, a carpenter who worked at his trade many years in Seattle, had three children: A daughter, Deceima (plaintiff in this case), and two sons, Francis Charles and William L., whose full name is William Lee Bender. Charles B. Bender had a brother in Canton, Ohio, whose full name is William Lee Bender and who is also known as William L. Bender, Lee Bender, and W. Lee Bender. Charles B. Bender borrowed from his brother, William L. Bender, in 1903, at which time Charles B. Bender's son William L. (his name is the same as that of his uncle) was eight years old, four hundred dollars to pay the purchase price of an unimproved lot in the city of Seattle. The deed, which recites a consideration of four hundred dollars and names George J. Phelan as grantor and William L. Bender as grantee, was acknowledged August 15, 1903, before notary John C. Whitlock, but was not placed of record until 1939. Charles B. Bender sent the deed to his brother in Ohio, presumptively to have effect as a mortgage to secure payment of the loan from William L. Bender to Charles B. Bender. There is no evidence that a note was given by the

borrower to the lender or that they entered into any contract to cover the transaction. In 1920, seventeen years later, following the death of the father of Charles B. and William L. Bender and the distribution of the deceased father's estate, William L. Bender remitted to Charles B. Bender his portion of the inheritance, less four hundred dollars retained to pay money borrowed by the Seattle brother from the Ohio brother, and returned to Charles B. Bender the deed in which William L. Bender is designated grantee. Charles B. Bender placed the unrecorded deed in his tool chest where it remained until after his death in 1939.

Charles B. Bender, immediately following purchase of the lot, built thereon a small cabin into which he and his family moved. During the ensuing years he constructed upon the lot a seven-room dwelling, which is substantially the same house that is now upon the lot. A great deal of the labor in construction of the house was performed by the father upon community time. That he purchased the construction materials with funds of the marital community and from those funds paid the maintenance expense and the taxes and other assessments against the property from 1903 to 1939, cannot be denied.

Charles B. Bender's wife died intestate May 10, 1910. Her community interest in the subject matter of this controversy was never administered in, or distributed by, the probate court. Charles B. Bender never remarried. He resided on the property until his death in 1939. His only daughter, plaintiff, kept house for him after his wife's death until her marriage, after which she often went to the old home to care for her father and the house.

Francis Charles Bender, second child of Charles B. and Carrie Bender, died in Alaska May 8, 1935, leaving a widow but no children. Charles B. Bender made his will May 14, 1936, by which he bequeathed one dollar to the widow of Francis Charles Bender, and devised the remainder of his property one-half to his daughter,

Deceima, and one half to his son, William L. The latter was named executor of the will of his father, who died in Seattle September 20, 1939. The son and executor, William L. Bender, filed the 1903 deed for record in the office of the auditor for King county October 19, 1939, one month after his father's death.

William L. Bender refused to recognize any rights of his sister in the home property. He insisted that the property was purchased for him in 1903, when he was eight years old, by his father; that, six months prior to his death, the father gave to him the deed with the explanation that the property had been purchased for and had always been the property of the son.

Plaintiff sister filed a petition in the probate department of the superior court for King county against her brother, as executor of their deceased father's estate, to remove him as executor for negligence in administering the estate and to require the inventorying of the property in controversy, as an asset of the deceased father's estate. A minute entry discloses that the court orally dismissed the petition without prejudice to bring an action to quiet title. The court stated:

"I will dismiss that petition, without prejudice to bringing action to quiet title, if anyone sees fit to bring such an action. This proceeding will not be *res adjudicata* of any such an action."

Deceima Bender Ness brought this action to quiet title in her to her interest in the property in controversy. She named as parties defendant her uncle, William L. Bender, and his wife, and her brother, William L. Bender, individually and as executor of the estate of Charles B. Bender, deceased. The trial court found that the property was the community property of Charles B. Bender and his wife, Carrie Bender, who died intestate, and whose community interest in the property vested immediately upon her death in 1910 in her three surviving children, which interest was

never formally distributed to the surviving children by the probate court.

A decree was entered quieting the title as between plaintiff and her brother, William L. Bender, to their respective portions (eleven twenty-fourths each) in the property and two twenty-fourths in the widow of Francis Charles Bender, subject to the rights of William L. Bender, as executor of the estate of his deceased father, to administer further the portions devised to plaintiff and to himself as a part of the estate of the decedent. William L. Bender, individually and as executor, appealed.

Counsel for appellant contends that in an action to quiet title the plaintiff must prevail, if at all, upon the strength of his own title and not upon the weakness of that of his adversary; and that, construing the testimony and inferences in the light most favorable to respondent, it cannot be held that she has sustained the burden of proof that she is the owner of an interest in the property.

■ ■ The presumption follows, when property is acquired by a spouse during coverture, that it is community property. *Woodland Lbr. Co. v. Link,* 16 Wash. 72, 47 Pac. 222. See, also, *In re Binge's Estate,* 5 Wn. (2d) 446, 105 P. (2d) 689. That presumption was not rebutted. Four hundred dollars was borrowed in 1903, by and on the credit of the marital community from the husband's brother, which was used in paying the purchase price of the lot, which was improved by construction thereon of a house with materials purchased by community funds, with labor for which payment was made by the marital community, and the maintenance expenses of, and taxes and assessments against, the property were paid by the husband from community funds. When the decedent borrowed the money from his brother in Canton, that loan was to the decedent as agent of the marital community. A community obligation was thereby created, which obliga-

tion had not been discharged at the time of the death of the wife in 1910. That borrowed money became community property and the property purchased therewith became community property, which status it retained until death of the wife in 1910. The fact that the loan of four hundred dollars was paid by the husband out of his separate funds inherited from his father seventeen years later did not change the status of the property, which was fixed at the time of its purchase in 1903 as community property. See *In re Binge's Estate, supra.* The serious question whether the husband could, without the consent of his wife, make such a substantial gift (as this would have been in 1903) of the community property to the eight year old son, is not raised.

■ The property was purchased and payment therefor made by the marital community and it was community property until the mother died in 1910. Immediately upon her death, the children became vested with an undivided one-half interest in the property. Rem. Rev. Stat., § 1342 [P. C. § 9848]. That is, each of the three children became vested with an undivided one-sixth interest in the property. The brother Francis Charles predeceased his father, who devised his one-half interest in the property in equal shares to his son (William L.) and his daughter (Deceima). The father could not devise the one-sixth of the whole that vested in Francis Charles, whose one-sixth interest at his (the son's) death vested in the son's widow, unless in the meantime the son had transferred his interest. There is no evidence in the record of such transfer nor is there any evidence that the son's widow is dead. The rights of widow of the son who died in 1935 were not adjudicated by the trial court, which did no more than quiet the title as between William L. Bender and his sister as to their respective portions in the property. The heirs, if any, of the deceased brother were left to such later adjudication as may be proper.

■ The superior court, sitting in probate, is not divested of any of its powers as a court of general jurisdiction. It has power in such a proceeding to determine every matter necessary to the due administration of an estate, when such matters are properly presented for its consideration. The dispute as to the ownership of the property described in respondent's petition to the superior court, sitting in probate, properly presented for consideration of that court an issue which it could have determined in the manner such issues are usually determined. The court's dismissal of that petition without prejudice to bringing an action to quiet title did not divest respondent of the right—her right was expressly preserved by the court—to maintain a suit in equity to quiet title, as between her brother and herself, to their respective portions of the property.

■ By virtue of her title to and/or interest in the property in controversy, respondent had the right to maintain the suit to quiet title; she prevailed upon the strength of her own title as well as upon the weakness of her brother's claimed title to the whole property instead of to a part only.

The contention that decedent's brother, William L. Bender, of Canton, Ohio, was defaulted, though mentally incompetent, is without merit. We do not find any competent evidence that he was ever legally adjudged mentally incompetent.

■ It is next contended that the trial court erred in refusing to permit appellant Bender to testify that, at the time he was given the deed by his father, the father explained why the property belonged to appellant. The trial court was convinced—he was in a better position than we to pass on the credibility of the party—that the offered testimony was untrue. The trial court observed:

"Now the boy claims that the father gave him the deed. That was objected to and I struck that out as

not competent. But let us stand on that matter, assume that ought not to be stricken out. He gave him the deed six months before death and said, 'This was intended for you.'

"Now what does that language mean, 'this was intended for you?' It couldn't mean but one thing, 'I am now giving you a deed that was intended for you, thirty-six years before that deed was intended for you.' That is unreasonable.

"The boy took the deed and immediately had it recorded at his request, and that is the basis for his claim now.

"In the meantime this father paid taxes right along promptly, paying subsequently over $1500 cash for assessments at one time, never once saying to the boy after he was grown and earning money, 'Son I am paying the taxes on your property.'

"Now gentlemen, the deed was not put on record until after the father died. Whether the boy found it in the tool box we don't know. I don't think it makes much difference. It is a certain fact that deed has for a long time lain in contact with oil. Now then I am asked to quiet title in this property. To do that I have got to fix the respective interests. Then the Probate Court will make a disposition at the final hearing in the Probate Court."

The decree is affirmed.

SIMPSON, C. J., STEINERT, JEFFERS, and MALLERY, JJ., concur.