[No. 28745-1-I.   Division One.   October 11, 1993.]

*In the Matter of the Marriage of* ROBERT T. SHORT, *Respondent, and* PATRICIA A. SHORT, *Appellant.*

*William T. Lawrie, Andrea M. Gilbert,* and *Lawrie & Gilbert,* for appellant.

*Hollis Holman; Douglass A. North* and *Maltman, Reed, North, Ahrens & Malnati, P.S.,* for respondent.

KENNEDY, J. — Patricia A. Short appeals the trial court's characterization and distribution of the stock options which the respondent Robert T. Short acquired as an incident of his employment shortly before the parties' separation, contending that the option rights were acquired during marriage and are entirely community property. She also challenges the trial court's "nonmodifiable" maintenance award.[1] Finding that the stock options were entirely community property and that the trial court erred in entering a "nonmodifiable" maintenance award in the absence of the parties' agreement, we reverse in part and remand for further proceedings.

## FACTS

The Shorts were married on July 15, 1978. They separated on January 19, 1989. Robert petitioned for dissolution of the marriage in February 1990. Following a trial in April 1991, the trial court entered its findings, conclusions and decree of dissolution of marriage on May 10, 1991.[2]

Robert, who was 37 years old at the time of trial and in good health, was employed as a design engineer at Microsoft Corporation. His annual gross salary was $101,000. Prior to the marriage, Robert received a national certificate in electronics in his homeland of Ireland, but he did not have a college degree. When the parties married, Robert was employed in Massachusetts as an engineering technician at Digital Corporation. He was earning $16,000 a year and had no assets.

Patricia was 39 years of age at the time of trial and unemployed. Prior to the marriage, she obtained an associate of

---

[1]Patricia raises several additional claims with respect to the trial court's maintenance, property and attorney fee awards, which we treat in the unpublished portion of this opinion.

[2]No children were born of this marriage and neither party has children of any other union.

arts degree from a 2-year college in New York. She was planning to transfer to a 4-year college in Florida when she met and married Robert, instead. She came into the marriage with $10,000 cash, a car which was paid for and various items of household furniture.

After the marriage, Robert continued to work for Digital Corporation in Massachusetts and he also took college courses. Patricia worked as a secretary in the Concord public schools. The parties purchased a home in Massachusetts, using a portion of Patricia's savings for the down payment.

In 1982, the Shorts moved to Washington State when Digital Corporation transferred Robert here. In November 1982, they purchased a home for $109,000, paying $45,000 down. The down payment came from the proceeds of sale of the parties' home in Massachusetts and from a bonus which Robert received from Digital Corporation for moving to Washington.

Patricia did not become reemployed in Washington. She maintained the family home and yard, handled the family finances, gave various parties at the marital home for her husband and his co-workers and, beginning in 1984, took classes in flower arranging, graphic arts and illustration.

Robert, while still employed by Digital Corporation, enrolled in a computer science program at the University of Washington, in 1984. In 1987, he obtained a masters of science degree. Robert testified that this degree enhanced his marketability. By 1988, Robert was earning $80,000 a year at Digital Corporation, where he was supervising 57 people.

In 1988, Digital Corporation asked Robert to transfer back to Massachusetts. Not wishing to do so, he terminated his employment and, along with several of his co-workers who also terminated their employments with Digital Corporation at the same time, began planning to establish a new computer science company. According to Robert, venture capital was being arranged when Bill Gates of Microsoft Corporation heard about the effort and approached the group "about a proposal that [Gates] had, which seemed really exciting, and we spent [a] significant amount of time negotiating

salaries and stock options, and I finally accepted the job at Microsoft in November [1988]".[3]

Robert's negotiated gross annual starting salary with Microsoft Corporation was $90,000, $10,000 more per year than he had been earning at Digital Corporation.[4] He also negotiated an option to purchase 25,000 shares of the $0.001 par value common stock of the company, for a price of $46 per share. Subsequently, on April 16, 1990, a stock split occurred, resulting in Robert's right to purchase 50,000 shares for $23 per share. By the terms of the option grant, Robert's right to purchase the shares vested over time, by the following schedule:

| | |
|---|---|
| 05/17/90 | 12,500 |
| 11/17/90 | 6,250 |
| 05/17/91 | 6,250 |
| 11/17/91 | 6,250 |
| 05/17/92 | 6,250 |
| 11/17/92 | 6,250 |
| 05/17/93 | 6,250 |
| Total | 50,000 shares @ $23 per share, to become fully vested by May 17, 1993 |

Thus, one-quarter of Robert's purchase rights under the option vested after 18 months of employment and the remaining three-quarters vested, in equal increments, at 6-month intervals thereafter. By the terms of the grant, any vested option shares not purchased in one 6-month period could be

---

[3]The parties separated on January 19, 1989.

[4]In August 1989, Robert's salary was increased to $95,000 and he received a bonus, that year, based on productivity and creativity. In August 1990, Robert's salary was increased to $101,000 and he received another bonus, this one for $10,000. Robert testified that he was an "engineering manager" at Microsoft, a "level 14", which is the second highest technical level at that company. Robert testified that there were approximately 20 people, at the time of trial, who were employed at "level 14". "Level 15", the highest technical level at the company, had only 5 members.

purchased in any subsequent 6-month period, so long as all such vested rights were exercised within certain time limitations not here relevant.

By its terms, the option would lapse, as to any unvested purchase rights, at the date of Robert's death, disability or termination of employment. Robert's option rights were granted pursuant to and governed by Microsoft's 1981 Stock Option Plan.[5]

The 1981 Stock Option Plan provided that Microsoft could grant two types of stock options to its officers and key employees: (1) nonqualified stock options (which are governed generally by section 83 of the Internal Revenue Code) and (2) incentive stock options (which are governed by section 422A of the Internal Revenue Code). Robert received the "nonqualified" type of option. By the terms of the plan, both types of options were intended to further the following company objectives:

> The purpose of this Plan is to encourage ownership of Common Stock of the Company by officers and key employees of the Company and any current or future subsidiary. This Plan is intended to provide an incentive for maximum effort in the successful operation of the Company and is expected to benefit the shareholders by enabling the Company to attract and retain personnel of the best available talent through the opportunity to share, by the proprietary interests created by this Plan, in the increased value of the Company's shares to which such personnel have contributed.[6]

In May 1990, Robert exercised his by then vested right to purchase 12,000 shares of Microsoft stock, leaving unexer-

---

[5]The option grant specifically provided that:

"This is not an employment contract and while the benefits, if any, of this option are an incident of the Optionee's employment with the Company, the terms and conditions of such employment are otherwise wholly independent hereof."

[6]The plan was administered by Microsoft's board of directors. The plan provides that in determining when and whether to grant an option, "the Board shall take into account the duties of the employee, the present and potential contributions of the employee to the success of the Company, and other factors deemed relevant by the Board in connection with accomplishing the purposes of this Plan."

cised his right to purchase 500 additional shares at that time.[7] By the time of trial in April 1991, Robert's right to purchase an additional 6,250 shares had vested but had not been exercised. Thus, Robert had the vested but unexercised right, as of the time of trial, to purchase an additional 6,750 shares, in addition to the 12,000 shares he had already purchased. This left the right to purchase 31,250 shares still unvested, as of the time of trial, but the right to purchase 6,250 of those additional shares was due to vest 7 days after entry of the findings and decree.

The parties' tangible community assets (exclusive of any interest of the marital community in the stock option or stock sale proceeds) had a net value of approximately $376,000. These the trial court divided disproportionately, awarding 65 percent to Patricia and 35 percent to Robert. Patricia, who initially had asked to receive the family home, changed her mind on the eve of trial and decided to return to her home state of New York. Accordingly, the home, by then worth some $225,000 and having a $34,000 mortgage balance, was awarded to Robert. Patricia received a $135,000 note, secured by a deed of trust against the home, for her share of the home equity.[8]

The trial court found that the Microsoft stock options were part community property and part Robert's separate prop-

---

[7]Robert purchased and then immediately sold all 12,000 shares. Some of the shares had a market value of $64.75 per share when they were sold while others had a market value of $71.50 per share. The (before tax) profit on the transaction was approximately $500,000. Robert testified that, by a special arrangement between Microsoft Corporation and the Alex Brown Company located in California, optionees wishing to exercise their option rights and immediately sell their stock could obtain a very short term (1 day, or so) interest-free loan for the purchase price of the stock. The loan was repaid from the stock sale proceeds. Federal withholding taxes of 20 percent of the profits and FICA taxes were also paid from the sale proceeds.

Robert purchased a Jeep and some furniture from these proceeds, prior to trial. At the time of trial, there remained some $410,516 in the Alex Brown account, subject however, to approximately $53,000 of additional income taxes still due and owing.

[8]The note was interest free for 6 months and payable in 6 months from the date of entry of the decree. Interest was awarded at the judgment rate, in case the note was not timely paid.

erty, reasoning that, to the extent that the option grant was an inducement for Robert to accept employment with Microsoft as the result of his skills and knowledge, the marital community had an interest therein. To the extent that the grant was based on Robert's future (postseparation) productivity, the trial court concluded that the options were Robert's separate property. The court, finding that the stock options were not the major inducement for Robert's decision to go to work for Microsoft, apportioned the community and separate interests and divided the option and stock sale proceeds as follows: (1) the funds in the Alex Brown account would first be applied to the 1990 federal income taxes still due and owing and the remainder would be divided equally between the parties; (2) the unexercised option to purchase the 500 additional shares which vested in May 1990, and the unexercised option to purchase 6,250 shares which vested in November 1990, would be divided 75 percent to Robert and 25 percent to Patricia; all the remaining (unvested) options would be awarded to Robert, their having been characterized as entirely his sole and separate property. Patricia was made responsible to provide the financing necessary to purchase her 1,687.5 vested but unexercised shares.[9]

At trial, Patricia sought sufficient spousal maintenance to enable her to relocate to New York and to return to college.

---

[9]The trial court intended to divide the community share of the options equally and to award to Robert all of his separate property interests therein. By the trial court's formula, the option to purchase 50,000 shares was apportioned and awarded as follows:

| Vesting Dates | Community Shares | Robert's Separate Shares | Awarded to Patricia | Robert |
|---|---|---|---|---|
| 05/17/90 | 12,000 (exercised) | 0 | 6,000 | 6,000 |
| 05/17/90 | 250 (unexercised) | 250 | 125 | 375 |
| 11/17/90 | 3,125 | 3,125 | 1,562.5 | 4,687.5 |
| 05/17/91 | 0 | 6,250 | 0 | 6,250 |
| 11/17/91 | 0 | 6,250 | 0 | 6,250 |
| 05/17/92 | 0 | 6,250 | 0 | 6,250 |
| 11/17/92 | 0 | 6,250 | 0 | 6,250 |
| 05/17/93 | 0 | 6,250 | 0 | 6,250 |
| Totals | 15,375 | 34,625 | 7,687.5 | 42,312.5 |
| (Percent of Total) | (30.75) | (69.25) | (15.38) | (84.62) |

The trial court noted the great disparity in the parties' earning power but found that this was only a "midterm" marriage, that Patricia's plan for future education was "unfocused" and that she had not established a "great need" for spousal maintenance, in view of the property division. However, the court found that Patricia was entitled to "some financial assistance from [Robert] which will permit her to relocate to New York and become settled in her new environment . . . without having to dip too far into principal." Robert was ordered to pay Patricia $750 per month for spousal maintenance for 12 months, commencing May 1, 1990. Robert was given leave to pay this maintenance in one accelerated lump sum if he so chose. Robert so chose. Thereafter, the trial court determined that the spousal maintenance award had been fully, finally and completely satisfied and provided in the decree that the maintenance award would be nonmodifiable by either party for any reason.

This appeal followed.

## DISCUSSION

### I

### Character of the Employee Stock Options

Patricia argues that the trial court erred by characterizing the lion's share of the Microsoft stock option grant as Robert's separate property. She argues that the option grant is a contractual right which is entirely community property since it was acquired during marriage. That the purchase rights mature over time is not, she contends, dispositive. The Washington courts have treated other fringe benefits of employment as community property even if not fully vested or matured by the time of divorce where the mere passage of a relatively short period of time will result in realization of the benefits. *See, e.g., Wilder v. Wilder,* 85 Wn.2d 364, 534 P.2d 1355 (1975).

Patricia also relies on *Freeburn v. Freeburn,* 107 Wash. 646, 182 P. 620 (1919) (husband's employment contract entitling him to receive $200 per month in salary and 7½ percent of net dividends of a mine as compensation for employment

was a community asset; wife entitled to receive one-half the net proceeds of the contract until it expired in 1920).

Robert does not contest the trial court's treatment of the unvested stock purchase rights as *property*. He argues that the trial court properly apportioned the community and separate shares therein. He argues that stock options are in the nature of "golden handcuffs", primarily designed to keep talented employees from leaving to join a competitor (or to establish a competing business). He argues that a trial court should examine the particular stock option plan at issue to determine what efforts of the employee are being compensated by the grant and that, where the efforts being compensated occur after separation, an option which vests thereafter should be treated as separate property of the employee spouse. As did the trial court, Robert relies heavily upon *In re Marriage of Hug*, 154 Cal. App. 3d 780, 201 Cal. Rptr. 676 (1984).[10]

Robert also points to Cross, *The Community Property Law in Washington (Revised 1985)*, 61 Wash. L. Rev. 13, 39-49 (1986). There, Professor Cross observed that Washington community property law has developed two different approaches for characterizing assets acquired over time, by a combination of community and separate funds. The "mortgage rule" focuses upon whether the parties become obligated to make payments in order to acquire an asset. Where there is such an obligation, the character of the property is determined as of the date of its acquisition, by the character of the down payment and any credit pledged. Where there is no legal obligation to

---

[10]The trial judge, although not applying the *Hug* "time rule" to the letter in this case, found the *Hug* approach generally to be a good way to determine the community and separate components of the stock options. The *Hug* court applied the following formula: the community property is a product of a fraction in which the numerator is the period in months between the commencement of the spouse's employment by the employer and the date of separation of the parties, and the denominator is the period in months between commencement of the employment and the date when the option is first exercisable, multiplied by the number of shares which can be purchased at that time. *Hug*, at 782.

*Cf. In re Marriage of Bulicek*, 59 Wn. App. 630, 800 P.2d 394 (1990) (approving the application of a similar formula in a pension case).

continue to make payments, however, such as with whole life insurance policies and retirement plans (one could allow the policy to lapse, instead; or one could change careers and forfeit any as yet unvested retirement benefits), Cross suggests that the character of the asset may appropriately be determined to be proportionate to the separate and community funds utilized to acquire it. Robert argues that the employee stock options here at issue are the latter type of asset. Robert also argues that *In re Marriage of Landry*, 103 Wn.2d 807, 699 P.2d 214 (1985) provides an apt analogy. There, the trial court's determination that 70 percent of the husband's military pension was his separate property was affirmed, because the parties had been domiciled in noncommunity property states during 70 percent of his military career.

In addressing this characterization issue, which is of first impression in Washington, we deal first with some commonly accepted terminology. A "stock option" is the right to buy a designated stock at a particular price for a specified period of time. Black's Law Dictionary 986-87 (5th ed. 1979). *See, e.g., Richardson v. Richardson*, 280 Ark. 498, 502, 659 S.W.2d 510, 512 (1983). Where the optionholder has the absolute right to exercise the purchase right at any time by paying the purchase price, the option is vested and matured. *Everett v. Everett*, 195 Mich. App. 50, 54, 489 N.W.2d 111, 113 (1992). If the option cannot be exercised until some future date, and then only contingent upon a future event, such as remaining an employee, the option is "unvested". *Everett. See also* Smetka, "Disposition of Options, Retirement and Other Future Benefits", *in Complex Property Division*, Washington State Bar Ass'n Seminar Handbook 338 (July 1993). "Fringe benefits" are any benefits of employment given in addition to regular compensation. Divorce Taxation 10,067 (Warren Gorham Lamont) (1989). To the Internal Revenue Service, an employee stock option is a form of "deferred compensation", and the issues, as between the employer, the employee and IRS, are when the employee must report the compensation and pay his or her federal withholding and his or her share of the FICA taxes thereon

and when the employer may deduct the corresponding business expenses. In effect, the employee accepts the employer's promise to pay in the future rather than a current cash payment and, if the employer's stock option plan has been carefully drawn so that it is accepted as a "nonqualified" plan by IRS, the employer need not fund the plan — as would otherwise ordinarily be required by the Employee Retirement Income Security Act of 1974 (ERISA). Divorce Taxation, at 10,068-69. "Nonqualified" benefits, such as those granted to Robert by Microsoft, usually take the form of a stock option. Where the option does not have a readily ascertainable value or is subject to a contingency (such as continued employment), the employee is not taxed on the benefit until the option is exercised. The employer and employee have more freedom to negotiate the terms of a "nonqualified" stock option than with other types of restricted plans. Generally, the decision to defer compensation for tax purposes must be made before the compensation is "earned". Divorce Taxation, at 10,071, 10,068. Without the election to defer, however, when separation and divorce intervene, the compensation ordinarily would have been paid during marriage.

Because the Washington appellate courts have not heretofore ruled on the community or separate character of employee stock options granted during marriage but vesting after separation or divorce, we next consider cases from other jurisdictions which have done so. We first note that virtually all of these jurisdictions have treated the stock options as "property", whether vested and matured, vested but unmatured, or unvested.[11]

---

[11]*See, e.g., Hug; Salstrom v. Salstrom,* 404 N.W.2d 848 (Minn. Ct. App. 1987); *Chen v. Chen,* 142 Wis. 2d 7, 416 N.W.2d 661 (1987); *Hall v. Hall,* 88 N.C. App. 297, 363 S.E.2d 189 (1987); *Callahan v. Callahan,* 142 N.J. Super. 325, 361 A.2d 561 (1976); *Green v. Green,* 64 Md. App. 122, 494 A.2d 721 (1985); *Smith v. Smith,* 682 S.W.2d 834 (Mo. Ct. App. 1984). The only exception appears to be Illinois. *See In re Marriage of Frederick,* 218 Ill. App. 3d 533, 578 N.E.2d 612 (1991). Although we are not called upon to rule directly on this issue, the parties not having disputed that the unvested options are property, we agree with the jurisdictions which have found even an unvested employee stock option to be

Most states which have considered the character of the property apply a "time rule" similar to *Hug*, at least where there is sufficient evidence to justify such an apportionment. *See Hug*; *Warren v. Warren*, 2 Ariz. App. 206, 407 P.2d 395 (1965); and several of the cases cited in footnote 11 of this opinion. *But see Smith v. Smith*, 682 S.W.2d 834 (Mo. Ct. App. 1984) (unvested stock options exercisable contingent upon continued employment held to be marital property already earned).

The "time rule" has had considerable appeal in various jurisdictions, largely, we believe, because it is so simple to apply. We find ourselves unpersuaded, however, by this simple (one could even say "simplistic") approach, at least under the undisputed evidence here extant.

Although Robert likens the stock option here at issue to "golden handcuffs" designed to keep him working at Microsoft and working hard, it is undisputed that the option was a negotiated benefit, obtained at a time when Robert was finalizing his plan to set up a new computer science firm. Robert testified that one of his coprincipals in the planned new venture was David Cutler, whom Robert described as "one of the top ten programmers in the world, and he [has] written some of the most successful operating systems in the world."[12] In describing his own talents in the industry, Robert modestly stated, "I don't think I'm very famous, no. I've written some papers and things, but I wouldn't consider myself famous." The "golden handcuff " analogy is no doubt apt, but a "golden handshake" analogy is at least equally apt, where such a valuable fringe benefit (which the trial court described as a "golden opportunity")[13] was offered as an inducement to forgo

---

"property" which is subject to the jurisdiction of the divorce court. To opine otherwise would be to ignore the nature of employee fringe benefits, which have become, in recent years, a major source of the total compensation an employee spouse may receive. Divorce Taxation, at 10,068.

[12]Robert testified that Mr. Cutler accepted a "level 15" position at Microsoft.

[13]The monetary value of the stock options was not an issue at the trial, although the valuation issue was raised in support of Patricia's motion for reconsideration. The parties have not briefed for this appeal the issue of how employee

the new business and go to work for Microsoft, instead. Although the trial court found that this "golden opportunity" was not "the major inducement" for Robert's decision to go to work for Microsoft, and although one of Microsoft's stated objectives in the Stock Option Plan is not only to attract but also to *retain* "the best available talent", it does not necessarily follow that Robert's *option rights* granted in November 1988 were yet to be "earned" in the same sense that his future salary and retirement benefits were yet to be earned, that is, by virtue of what turned out to be largely his post-separation labor.

In Washington, all property "acquired" during marriage is community property unless it is acquired or owned as prescribed in RCW 26.16.010 and .020, defining separate property. RCW 26.16.030. In the case of *In re Marriage of Brown*, 100 Wn.2d 729, 737, 675 P.2d 1207 (1984) our Supreme Court construed "acquired" to encompass wages and other property "onerously" acquired through the toil, talent or other productive faculty of either spouse, or by way of a gift to the marital community.

In the recent case of *In re Marriage of Sedlock*, 69 Wn. App. 484, 506, 849 P.2d 1243 (1993) this court characterized certain stock warrants[14] which were acquired during marriage by the payment of community funds and the extension of community credit (but paid for in significant part after separation with separate funds) as community property, subject only to a right of reimbursement for the separate contribution. In so ruling, we adhered to the premise that the character of the warrants was determined at the time they were "acquired", regardless of the fact that they were being purchased over time and eventually were paid for, in part, with separate funds. *Sedlock*, 69 Wn. App. at 506.

---

stock options might be valued. Nor has the issue of the mechanics of distribution to the nonemployee spouse been addressed. Accordingly, those questions are beyond the scope of this appeal.

[14]A stock "warrant" is essentially a stock "option" which is sold to the general public. Black's Law Dictionary 1422 (5th ed. 1979).

In the case of *In re Estate of Binge*, 5 Wn.2d 446, 484, 105 P.2d 689 (1940) our Supreme Court held that, as between a husband and wife, real or personal property acquired through a contractual obligation has its origin and is "acquired" as of the date when the obligation becomes binding and not as of the time when the money is paid or the thing is delivered or conveyed. "The fruit of the obligation is legally acquired as of the date when the obligation becomes binding." 5 Wn.2d at 484.

██ ██ An option to purchase any kind of property is a bilateral contract, under which the grantor is obligated to sell at a fixed price within a certain time, but under which the grantee has the choice of buying or not buying for that same price. The option gives the grantee a right of election to exercise a privilege. Black's Law Dictionary 986-87 (5th ed. 1979). Here, in November 1988, Microsoft became legally obligated to sell a specific number of shares of its common stock to Robert at a fixed price during various times in the future, conditioned only upon Robert being employed by Microsoft at those relevant times. Robert's right of election, which he obtained in 1988, was presumptively acquired for the benefit of the marital community, and there need be only a *potential* of such benefit to invoke the presumption. *Brubaker v. Hovde*, 45 Wn. App. 44, 47, 723 P.2d 1193 (1986). By the option terms Robert's right of election would mature in steps over periods of time ranging from 18 to 54 months from the date Microsoft's obligation to sell at the fixed price became binding. Robert and Patricia's separation and subsequent divorce had no effect whatsoever upon Microsoft's legal obligation to honor the right of election, if, as and when it is exercised within the terms provided in the grant and in the plan. We see no reason why the value of a right of election onerously acquired for the benefit of the marital community should be lost to the community, merely because of separation and divorce.

Our federal tax laws are not necessarily the tail that wags the dog. An election to defer the receipt of property or other forms of "compensation" to some future time, by a system

designed to meet the esoteric requirements of section 83 of the Internal Revenue Code, does not change the character of the property or compensation that is being deferred. The issue for purposes of state community property law is not when the property may be considered to have been "earned" for purposes of federal taxation, but when the property right is considered to have been "acquired" under state property laws relating to husbands and wives. Divorce Taxation, at 10,067. *Cf. Wilder*, 85 Wn.2d at 367 (when a pension "vests" for purposes of community property law does not require certainty that benefits will in fact be paid).

Although the California Supreme Court approved a "time rule" formula for a portion of the employee stock options at issue in *Hug*, that court also ruled that there was substantial evidence to support the trial court's (implied) finding that another portion of the stock options, which the trial court treated as entirely community property, were granted to replace benefits the husband left behind at his previous place of employment, and thus operated as an inducement to the husband to go to work for the new employer. These particular options were properly seen, the *Hug* court ruled, as compensation "earned" from the very outset of the employment, although some of these same options could not be exercised until after separation. *Hug*, at 789-90. Moreover, harkening back to one of California's pension cases, the *Hug* court noted that the community's share of a retirement benefit must reflect the extent of the community effort "in *earning the contractual right to receive those benefits*." *Hug*, at 791.

Here, we note that the marital community invested a considerable amount of time, effort and money into Robert's master's degree in computer science, improving his marketability and thus his negotiating power when he was faced with the choice of going to work for Microsoft or continuing with his plans to establish a new computer science company. Whether the Microsoft stock option he negotiated was the "major inducement" for Robert's ultimate decision begs the real question, which is the character of the option right he did in fact acquire.

Pension and other types of retirement benefits ordinarily are a function of on-the-job longevity, and the amount of the monthly or lump sum benefit eventually to be received usually increases over a period of many years as the employee contributes additional years of service, also usually (or so the employee hopes) at a higher rate of pay as he or she grows in seniority, experience and job responsibility. Both the additional time and the additional pay increase the value of the ultimate benefit. A time rule approach to the apportionment of such a retirement benefit makes a great deal of sense. In the case of employee stock options, the option price is fixed at the time of the option grant and the ultimate value of the fringe benefit, at least in the case of an industry giant such as Microsoft, is less a function of any individual employee's time, effort and talent than it is a function of the performance of many individuals unrelated to one another except in terms of the place and nature of their employment. Market conditions based upon supply and demand, foreign competition, government regulations and a myriad of other factors entirely outside the control of any individual or even a giant corporation also play a major role in the potential value of the benefit. The time required to fully realize the benefits of such a plan is usually relatively short, in comparison to that of most types of traditional retirement plans. To automatically apply the time rule to such a benefit merely because the granting employer hopes to retain a valuable employee with "golden handcuffs" makes little if any sense, in terms of community property law.

We are not persuaded that the community character of the contractual right here at issue changed in any way after the date it was acquired, by virtue of the parties' separation and eventual divorce or by the changed character (by operation of law) of Robert's individual labors as an employee following the separation and divorce. That an optionee may elect to forgo the privilege of exercising a right to purchase an asset at the option price does not, in our view, change the character of the privilege to do so. In the case of an unvested/unmatured or unexercised stock option, what the divorce

court must dispose is the *option*, the "privilege" as it were, to purchase the stock at the fixed price at some specific time in the future. Such privilege may become extremely valuable or it may become worthless (if the market value of the stock drops below the option price) or lost altogether (if the employee dies, becomes disabled or terminates the employment for any reason prior to the option right maturing), but we hold that the changed marital status of the optionee does not alter the character of the privilege. Here, the stock options at issue are entirely community property.

In so ruling, we are mindful, as Robert points out, that what is "good for the goose" in this particular case must be equally "good for the gander" in some future case having similar facts, if the stock option there at issue were to have been acquired shortly before marriage, and if it were to mature in increments during marriage. We are not disturbed by this corollary. The time rule does not become any more persuasive if the tables are turned, so to speak. This is not a gender-based issue, notwithstanding that (as is argued by Patricia) in our society husbands more often serve primarily as breadwinners and wives more often serve primarily as homemakers. Those gender-based factors are extremely relevant when it comes to the equitable division of property and to the award of spousal maintenance. Those factors are not relevant to the *characterization* of an asset as community or separate property.

## II
### Spousal Maintenance

Patricia contends that the trial court abused its discretion by entering a nonmodifiable maintenance award in the absence of any agreement by the parties as provided in RCW 26.09.170(7).

Here, the trial court granted Robert the privilege of accelerating the monthly payments. Robert exercised the privilege and the court thereupon provided in the decree that "[t]he maintenance award shall be non-modifiable by either party for any reason." RCW 26.09.070(7) allows such a provision to be included in a decree if the parties have agreed in a separa-

tion contract that their maintenance agreements, once approved by the court, shall not be modifiable. RCW 26.09.170(1) provides that, except as otherwise allowed by RCW 26.09- .070(7), a maintenance award shall be modifiable, but only as to "installments *accruing* subsequent to the petition for modification . . .". (Italics ours.) The word "accruing" has not heretofore been interpreted by the courts in this context.

Black's Law Dictionary 19-20 (5th ed. 1979) defines "accrue" as to fall due and to vest. For tax purposes, income "accrues" to the taxpayer when there arises a fixed or unconditional right to receive it. A cause of action "accrues" when a suit may be maintained thereon. "Accrued alimony" is defined as alimony which is due but not yet paid.

It is clear from RCW 26.09.070(7) and .170(1) that the Legislature did not intend to empower the trial courts to limit or preclude the modification of a spousal maintenance award in the absence of an express and written agreement to that effect, freely and voluntarily entered into by the parties. There was no such agreement here.

Although we do not wish to wholly preclude maintenance acceleration clauses,[15] we hold that such a clause may not operate to defeat the modification provisions of RCW 26.09- .170, absent an express agreement of the parties. Accordingly, we reverse the nonmodification provision. The acceleration clause is not otherwise disapproved in this case, Patricia having raised no allegation of a particularly adverse tax result.[16] Where the court grants a prepayment privilege or

---

[15]We can conceive of situations where an acceleration clause might serve the best interests of *both* parties. An obligor might be planning to travel to a remote location and, after verifying that there would be no unintended "alimony recapture" under section 71 of the Internal Revenue Code, might wish to prepay his or her obligation, in case of a mishap or for pure convenience. An obligee might not object if there would be no particularly adverse tax result or if the desirability of certainty of receipt were to outweigh any such tax consequences (or if plans for remarriage might otherwise result in an early termination of the maintenance award).

[16]We observe that the prepayment clause gave rise to $3,000 of additional taxable income to Patricia for 1991, which she otherwise would not have received until 1992.

the payor unilaterally accelerates the payments with an eye to accomplishing the same "nonmodifiability" here attempted, we hold that the modification award will remain modifiable for the duration of the maintenance period, notwithstanding the prepayment.

We reverse the trial court's apportionment and distribution of the stock option rights and its "nonmodifiable" maintenance award and remand for such further proceedings as shall be consistent with this opinion.

A majority of this panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

SCHOLFIELD, J., concurs.

GROSSE, J. (concurring) — I concur with all parts of the opinion except that with respect to spousal maintenance, in which I concur in the result only.

Review granted at 123 Wn.2d 1025 (1994).